The FIRST NATIONAL BANK OF BOWIE, Plaintiff–Appellant,

v.

The FIDELITY AND CASUALTY COMPANY OF NEW YORK, Defendant–Appellee.

No. 80–1616
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

Jan. 23, 1981.
Rehearing Denied Feb. 19, 1981.

Cantey, Hanger, Gooch, Munn & Collins, Sloan B. Blair, Fort Worth, Tex., for plaintiff–appellant.

Vial, Hamilton, Koch, Tubb, Knox & Stradley, James A. Knox, Stephen L. Baskind, Dallas, Tex., for defendant–appellee.

Before GEE, RUBIN and RANDALL, Circuit Judges.

PER CURIAM:

This appeal arises from an action brought by the First National Bank of Bowie (Bank) against the Fidelity and Casualty Company of New York (Company) for indemnity for attorneys fees and court costs pursuant to the terms of a banker's blanket bond (Bond) issued by the Company in favor of the Bank. The fees and costs were expended in the defense of seven lawsuits brought

against the Bank, all alleging a conspiracy to defraud various persons through a forgery and check kiting scheme perpetrated by Flynn W. Stewart, a director of the Bank at the time of the alleged scheme, and purportedly facilitated by Charles W. Cofield, the President and Chairman of the Board of the Bank. The Bank prevailed in all seven lawsuits, and then sought to recover the expenses of its defense from the Company. These expenses are stipulated by the parties to be $33,808.72. The Company refused to pay these costs and the Bank brought suit in the United States District Court for the Northern District of Texas. The Company argued in defense that three separate requirements of the Bond were not met by the Bank. The district court originally found no merit in any of the Company's defenses, and rendered judgment in favor of the Bank on October 29, 1979. The court amended its judgment, however, on April 3, 1980; finding merit in one of the Company's defenses, it rendered an amended judgment in favor of the Company. The Bank now appeals from this final judgment against it. We find no merit in any of the Company's defenses, and we therefore reverse the judgment of the district court. We must begin, however, by reviewing the relevant terms of the Bond; we thereafter consider the Company's defenses in turn.

### THE RELEVANT PROVISIONS OF THE BOND

The Bond provisions are divided into three separate categories. The first part of the Bond is entitled "Insuring Agreements;" in it, the Company agrees to indemnify the Bank for a variety of losses "sustained by the Insured at any time but discovered during the Bond Period," including, in a provision entitled "Fidelity," losses caused by the dishonest or fraudulent acts of employees. The second part of the Bond is entitled "General Agreements;" it includes the relevant provision on "Court Costs and Attorneys' Fees." The third part of the Bond establishes "Conditions and Limitations" to the "Foregoing Insuring Agreements and General Agreements;" it

includes a provision entitled "Loss–Notice–Proof–Legal Proceedings."

The Bank seeks indemnity pursuant to paragraph D of the "General Agreement" portion of the Bond. In pertinent part, this paragraph provides:

D. The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond.... In consideration of such indemnity, the Insured shall promptly give notice to the Underwriter of the institution of any such suit or legal proceedings; at the request of the Underwriter shall furnish it with copies of all pleadings and other papers therein; and at the Underwriter's election shall permit the Underwriter to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of the Underwriter's own selection.

The Bank claims that the seven suits against it alleged facts which, if proven, would have established a valid claim against the Bank of the sort indemnified by the fidelity clause (clause (A)) of the "Insuring Agreements." Clause (A) is as follows:

(A) Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees, of Property held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

In addition to arguing that the Bank does not qualify for indemnity under these provisions, the Company relies on "Conditions and Limitations" section 4 (Loss–Notice–Proof–Legal Proceedings) for its defense. In pertinent part, the section provides:

Section 4.... At the earliest practicable moment after discovery of any loss hereunder the Insured shall give to the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars.

A rider to the Bond makes the following change in this section:

Anything in the attached bond to the contrary notwithstanding . . . :

(a) Filing of Claim: Within 100 days after discovery of loss under said bond by the Insured or, if a corporation, by any director thereof or by any officer thereof not in collusion with the person in default, the Insured shall furnish to the Underwriter affirmative proof of loss with full particulars in writing, including dates and items of loss, duly sworn to.

The Company begins its defense with the proposition that, in order for attorneys fees and court costs to be awarded to the Bank pursuant to paragraph D, the suits it was forced to defend must assert claims "which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of the Bond." The Company argues that the Bank fails to meet the requirements of paragraph D in three independent respects: (1) the potential loss (i. e., the seven lawsuits) does not fall within the fidelity clause of the Bond; (2) the Bank did not discover the loss within the effective period of coverage of the Bond (as is required by the preamble to the "Insuring Agreements"); and (3) the Bank did not comply with the proof of loss requirement of section 4 of the "Conditions and Limitations." The district court originally rejected all of these arguments, but on rehearing accepted the third. Since the Company raises the first two again on appeal, we will consider all three of its contentions.

## 1. THE POTENTIAL LOSS AND THE FIDELITY CLAUSE

■ The Bank is indemnified under the Bond for attorneys fees and court costs expended in defense of any suit in which a judgment against the Bank would constitute "a valid and collectible loss sustained by the Insured under the terms of the bond." The Bank asserts that any judgment resulting from the seven suits at issue would have been indemnified as a loss covered by the fidelity clause of the Bond. The district court looked to the facts alleged in the complaints which initiated these suits and concluded that the Bank's contention is correct:

The allegations made in each lawsuit were directed at the official actions taken by Coffield with regard to Stewart's account. Each lawsuit alleged that the Bank acted in a conspiracy to defraud. In each lawsuit, proof that the Bank acted in a conspiracy to defraud would have required proof that its agent, Coffield, acted in a conspiracy to defraud. The Bank would have been liable as principal for any such proven fraudulent conduct by Coffield. The fidelity clause of the bond covers indirect losses that result from vicarious liability created by an employee's dishonest or fraudulent action against a third person. See National Surety Corp. v. Rauscher Pierce & Co., 369 F.2d 572, 578 (5th Cir. 1966); 13 Couch on Insurance 2d § 46:01. See also Great American Ins. Co. v. Langdeau, 379 S.W.2d 62, 65 (Tex.1964). Accordingly, the Court holds that the claims alleged in each of the seven lawsuits, if successfully proven, would have been covered by the fidelity clause of the bond.

Memorandum Opinion, October 29, 1979, at 6.

The Company disagrees with this analysis because the Bank at all times openly supported its president and at no time admitted that he had actually participated in a conspiracy to defraud others. As the Company states in its brief:

Although the Bank would have the Court believe the loss potentially resulting from the seven lawsuits would support a fidelity claim, the Bank has refused to accuse

Coffield of any wrongdoing. If the Bank knows all facts relating to Coffield's alleged acts and, yet, the Bank has never disavowed those acts, but instead, has accepted and acquiesced therein and told the Company such acts were not sufficient to amount to dishonesty, then the Bank cannot now say that loss potentially resulting from those acts is dishonesty with [sic] Clause (A).

Appellee's Brief at 14–15. This argument is frivolous. The determinative factor is whether facts alleged in the complaint would, if proven, establish a claim indemnified by a loss clause of the Bond. Whether or not the Bank actually believes the claim to be true, that is, whether or not the Bank openly accuses its employee of the allegations contained in the complaint, is completely irrelevant. This principle is established in cases cited in the Company's brief. *See Aetna Casualty & Surety Co. v. Southern Brokerage Co.*, 443 S.W.2d 45 (Tex. 1969); *National Surety Corp. v. First National Bank of Midland*, 431 S.W.2d 353 (Tex.1968); *White Rock National Bank v. U. S. Fire Insurance Co.*, 562 S.W.2d 268 (Tex.Civ.App.–Tyler 1978, writ ref. n. r. e.). The Company argues nevertheless that the Bank somehow ratified Coffield's actions because it refused to accuse him of wrongdoing. There is considerable doubt whether the Bank has the *power* to acquiesce, for purposes of an insurance fidelity clause, in the dishonest conduct of its employees insofar as that conduct is adverse to the interests of the Bank. *See Federal Deposit Insurance Corp. v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 739 (5th Cir. 1970). But in any case it is clear that the Bank did not ratify the actions alleged in the complaint, *i. e.*, participation in a conspiracy to defraud others through the operation of a forgery and check kiting scheme. The Bank merely refused to acknowledge that the allegations were true. The serious error in the interpretation urged by the Company is underscored by the choice it would force upon the Bank: the Bank would have to choose between supporting an employee which it believes not to be guilty of the charges brought against him, and accusing the employee in order to seek indemnity for its attorneys fees and court costs. There is no indication in the record that this result was intended by any of the parties. We conclude, therefore, that the lawsuits at issue all asserted claims which, if established against the Bank, would have been indemnified under the fidelity clause of the Bond.

## 2. THE BANK'S DISCOVERY OF A LOSS WITHIN CLAUSE (A)

■ A preamble to the "Insuring Agreements" portion of the Bond limits the coverage of the Bond to losses "sustained by the Insured at any time *but discovered during the Bond Period.*" (emphasis added). The district court found that the Company had cancelled the Bond as of July 1, 1974, but also found that the Bank had discovered its potential loss under clause (A) on April 26, 1974, when it received from attorneys for third parties a demand letter asserting a claim against the Bank based on Coffield's alleged participation in a conspiracy to defraud others.

■ Citing no authority, the Company argues that the Bank did not discover any loss within the Bond Period because it did not discover any actual dishonesty on the part of Coffield. This argument is frivolous. It is true that, according to the Bank's own admissions, it discovered no dishonesty and lost no lawsuit arising out of the alleged forgery and check kiting scheme. The Bank discovered only that a claim against it was being made on the basis of certain purported actions of its President; as the Bank repeatedly states throughout its argument, it discovered no dishonesty because none in fact existed and suffered no monetary loss because it lost none of the seven lawsuits. Whether the Bank actually discovers dishonesty or actually incurs a loss is, however, completely irrelevant. A loss is "discovered" within the meaning of the loss provisions of the Bond when the insured party discovers facts sufficient to create a condition in which the insured might be subjected to a claim against which it is indemnified by the Bond. *See Fidelity Savings & Loan Associ-*

*ation v. Republic Insurance Co.*, 513 F.2d 954 (9th Cir. 1975); *Federal Deposit Insurance Corp. v. Aetna Casualty & Surety Co.*, 426 F.2d 729 (5th Cir. 1970); *Mount Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 224 F.Supp. 666 (E.D.Va.1963); *National Surety Corp. v. First National Bank . of Midland*, 431 S.W.2d 353 (Tex. 1968). As the Supreme Court of Texas has made clear:

> [I]t makes little sense to say that [the Company] has agreed to pay the insured's attorneys' fees when suits have been unsuccessfully defended and it has thereby been required to make heavy indemnity payments, but that it has not agreed to pay attorneys' fees when suits have been successfully defended and it has thereby been protected against heavy indemnity payments.

*National Surety Corp. v. First National Bank of Midland, supra* at 355. Of course, the Company has not argued that the Bank would have to lose the suits in order to seek indemnity for attorneys fees and court costs. Instead, it argues that "discovery of a loss" occurs only when the Bank uncovers actually dishonest acts on the part of an employee; thus, it seeks to limit its liability for fees and costs expended in the successful defense of lawsuits to those suits in which the Bank has discovered, in effect, that the claims alleged in the complaint are true. This interpretation makes little sense and the Company cites no authority to support it. We conclude, therefore, that the Bank discovered the loss within the period of Bond coverage.

### 3. TIMELY PROOF OF LOSS

■■ A rider to the Bond requires the Bank to file within 100 days after discovery of a loss covered by the Bond an "affirmative proof of loss with full particulars in writing, including dates and items of loss, duly sworn to." It is undisputed that the Bank never filed a proof of loss document within the meaning of this provision. However, Texas law requires no more than *substantial compliance* with insurance policy requirements for proof of loss. *Rogers v. Aetna Casualty & Surety Co.*, 601 F.2d 840,

844 (5th Cir. 1979), and cases cited therein. The district court found in its initial memorandum opinion that the Bank had in fact substantially complied with the Bond's proof of loss provision. In so deciding the court relied on the facts that the Bank had forwarded to the Company the demand letter and the pleadings in all of the suits, and had in an earlier letter detailed the facts learned in its own investigation of Stewart's and Coffield's activities. The district court issued an amended memorandum opinion and order, however, on April 3, 1980. In this opinion the court decided that the Bank had *not* substantially complied with the proof of loss provision. The court explained its change as follows:

> The Court's prior· determination that the Bank substantially complied with the proof of loss provisions of the bond failed to take into account the fact that the essence of a proof of loss is the assertion by an insured of its claim against the bond. A proof of loss is the mechanism by which an insured asserts ·a claim against the bond. In the prior opinion, the Court focused on the information supplied to the Company by the Bank and found that the information was sufficient to apprise the Company of the facts that the Bank had learned concerning Coffield's activities. *But mere notice of the facts to the Company is not enough; the Bank must have made a claim against the bond for indemnity of any damage it incurred as a result of Coffield's activities.*

Memorandum Opinion, April 3, 1980, at 2–3 (emphasis added). On this basis the court concluded that the Bank was not entitled to indemnity for its attorneys fees and court costs under the Bond; it therefore entered a judgment in favor of the Company.

On appeal, the Bank argues that it provided all the "notice" and "proof of loss" it was capable of providing under the circumstances. The Bank asserts, in particular, that it could not file any "claim" against the Company, and could not detail "full particulars in writing, including dates and items of loss," because it had not in fact

suffered an adverse judgment and therefore had no "loss" to prove to the Company. The Company concedes that the literal requirements of the proof of loss provision could not and need not be met in this case. The Company argues, however, that at a minimum the proof of loss provision required the Bank to submit a "contingent proof of loss:"

> What must the Bank do to comply with the Bond? At the very minimum the Bank must inform the Company, even though the Bank has complete faith in its officer and does not believe that the allegations of dishonest conduct to be true, that its intent is to look to the insurer for the principal indemnity under Clause (A) and for indemnity for attorneys' fees, if the allegations are proven to be true or the case is settled resulting in loss to the Bank. . . . That is, the Bank must file with the insurer a contingent proof of loss stating if the lawsuit is lost, the Bank will look to the insurer for indemnity.

Appellee's Brief at 23. The Company argues, therefore, that the Bank cannot seek indemnity for attorneys fees and court costs under paragraph D of the Bond unless it has made a "contingent proof of loss" within 100 days of its discovery of the potential lawsuit. As the Company explains, such a proof of loss would consist of the Bank's notification to the Company that if the allegations alleged in the lawsuits are proven to be true, the Bank will look to the Company for principal indemnity.

We need not decide, however, whether the Company's interpretation of the proof of loss requirement (which was apparently adopted by the district court) is correct, for we believe that the Bank must prevail in either case. Assuming for the purpose of this opinion that the proof of loss provision obligated the Bank to notify the Company within 100 days of its receipt of the demand letter that it would look to the Company for indemnification in the event that it lost any of the lawsuits at issue, an examination of the record convinces us that the Bank substantially complied with this requirement.

On May 7, 1980, the Bank forwarded the demand letter to the Company with the following explanation:

> In order to provide notice under the above bond, the enclosed letter sent to our Bank . . . is herewith forwarded for your information.

Record at 52. The Company acknowledged receipt of the demand letter in a letter to the Bank dated May 10, 1974. The letter states, in pertinent part:

> The Fidelity and Casualty Company of New York does accept this *as notice of a possible claim* under the Bankers Blanket Bond . . . .

Record at 55 (emphasis added). The Bank forwarded to the Company each complaint in the seven lawsuits as it was received. The first citation was sent to the Company on July 24, 1974; an accompanying letter makes the following statement:

> Since the action *may involve a claim* against our Blanket Bond, I would appreciate hearing from you in the near future as to what information you need.

Record at 57 (emphasis added). Similar statements were made in each successive letter forwarding a citation to the Company. Record at 59, 60, 61. It is true that none of these communications state a formal claim against the Company, and that none of them state as a matter of certainty that the Bank would look to the Company for indemnity in the event that any of the suits were lost. But these communications must be read in the context of the ongoing litigation with which they dealt. At this early stage the Bank had little information other than the complaints themselves. These they forwarded to the Company, with the explanation that the suits might "involve a claim against our Blanket Bond." The Bank did not and could not know within 100 days of its receipt of the demand letter that it actually would file a claim against the Company in the event the suits were lost. After receiving two of the citations, the Company informed the Bank, in fact, that the allegations stated in the complaints would *not* bring the suits within the purview of the Bond. Record at 58. It is

clear, therefore, that the Bank gave the Company all of the notice and made as much of a proof of loss as was possible under the circumstances: the Bank forwarded all of the pleadings to the Company and told the Company that it believed the suits might state claims for which the Bank was indemnified by the Bond. Even assuming, therefore, that the proof of loss provision required the Bank to notify the Company of its intention to look to the Company for primary indemnity in the event it lost the suits, the Bank's communications to the Company substantially complied with the requirement.

## CONCLUSION

The Bank successfully defended against a number of suits which alleged facts which, if proven, would have established claims against the Bank for which the Bank would have been indemnified under clause (A) of the Bond. The Bank discovered, within the Bond Period, facts sufficient to indicate that it might be subjected to a claim for which the Bond provided indemnity. Assuming that the proof of loss provision of the Bond requires the Bank to make a "contingent proof of loss" within 100 days of its discovery of a potential lawsuit asserting claims for which the Bank may be indemnified by the Bond, the Bank substantially complied with the requirement by forwarding all of the pleadings to the Company with the explanation that the suits might involve claims under the Bond. We conclude that the Bank is entitled to judgment in the full amount of the stipulated reasonable attorneys fees and court costs, that is, \$33,808.72. We therefore reverse the judgment of the district court.

REVERSED.