**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 96-11465
_____

LYNCH PROPERTIES INC,

                              Plaintiff - Appellant,

versus

POTOMAC INSURANCE COMPANY OF ILLINOIS,

                              Defendant - Appellee.

Appeal from the United States District Court
For the Northern District of Texas

May 19, 1998

Before JONES, EMILIO M. GARZA, and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Lynch Properties, Inc. ("Lynch Properties") appeals the district court's grant of summary judgment for Potomac Insurance of Illinois ("Potomac"). The district court held that an employee dishonesty insurance policy issued by Potomac to Lynch Properties did not cover the misappropriation of money by a Lynch Properties employee from a customer's separate personal bank account. We affirm.

I

Potomac Insurance of Illinois ("Potomac") issued a master

insurance policy to Lynch Properties, covering liability, property loss, and employee dishonesty. This action arose when Lynch Properties discovered that Eva Bartlett, a bookkeeper whom it employed, had misappropriated money from the separate personal bank account of Martha Lynch ("Mrs. Lynch"). Mrs. Lynch, the mother of Harry Lynch, president of Lynch Properties, paid Lynch Properties an annual lump sum fee to manage her property and investments pursuant to an oral contract. Mrs. Lynch also paid Lynch Properties to perform bookkeeping services for her personal bank accounts. These bookkeeping services included writing checks to pay bills, reconciling bank account statements, and preparing financial statements. The personal bank accounts in question were held first at Cullen Frost Bank, and later at Comerica Bank, all in Mrs. Lynch's own name. The funds in the personal bank accounts did not derive from Lynch Properties investments or property, and no formal written agreement existed for Lynch Properties' handling of these funds.

Eva Bartlett kept the books for Mrs. Lynch's investment and personal bank accounts and handled requests for spending money by Mrs. Lynch. At least every week, Bartlett prepared a $600 check drawn on Mrs. Lynch's personal accounts, obtained an authorized signature on the check, went to the bank, cashed the check, and then gave the cash to a courier service for delivery to Mrs. Lynch. Only Mrs. Lynch, Harry Lynch, and Mrs. Lynch's other son, Bill Lynch, had the authority to sign checks drawn on these personal accounts. By periodically drawing up an extra $600 check, which

she had Harry Lynch sign, and then cashing the check and pocketing the cash, Bartlett ultimately misappropriated approximately $19,000 from Mrs. Lynch's personal bank accounts.

When Lynch Properties discovered that funds were missing from the personal bank accounts, it reimbursed Mrs. Lynch and filed a claim under the employee dishonesty portion of the policy issued by Potomac. Potomac denied coverage after investigating the claim, and this suit followed. The district court granted Potomac's summary judgment motion, concluding that no material dispute of fact existed to show that Lynch had suffered a loss under the policy. Lynch Properties' timely appeal followed.

## II

We review a district court's grant of summary judgment motion *de novo. See New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). We also review district court determinations of state law *de novo. See Salve Regina College v. Russell*, 499 U.S. 225, 239, 111 S. Ct. 1217, 1221, 113 L. Ed. 2d 190 (1991). Summary judgment is appropriate where the record discloses "that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case. *See Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). Once the

moving party meets this burden, the nonmoving party must set forth specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings. *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.*; *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3189, 111 L. Ed. 2d 695 (1990).

This case comes before us through diversity jurisdiction, and we accordingly apply Texas law as we believe the Texas Supreme Court would. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79, 58 S. Ct. 817, 822, 82 L. Ed. 518 (1938). The Texas Supreme Court has stated that the rules of interpretation and construction generally applicable to contracts are equally applicable to insurance contracts. *See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1994). Effectuating the true intent of the parties as expressed in the insurance policy is the primary concern of the court. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). We construe the policy to give effect to each term in the contract and to avoid rendering any term a nullity. *See Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n*,

783 F.2d 1234, 1238 (5th Cir. 1986). However, "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Forbau*, 876 S.W.2d at 132-33. We also attempt to interpret uniformly the provisions of the policy where, as here, the provisions at issue are similar across jurisdictional borders. *See National Union Fire Ins. Co.,* 907 S.W.2d at 522. Thus, when no Texas court has interpreted a particular provision, we look to the courts of other states for guidance as to how the Texas Supreme Court might interpret an issue. *See Dickson v. State Farm Lloyds*, 944 S.W.2d 666, 668 (Tex. App. 1997, n.w.h.) (interpreting insurance policy provision no Texas court had previously addressed by looking to the courts of other states).

If the provisions of the insurance contract can be given a "definite or certain legal meaning," then the insurance policy is not ambiguous. *See National Union Fire Ins.*, 907 S.W.2d at 520. Disagreement over the meaning or interpretation of a term is not sufficient to make a provision ambiguous or to create a question of fact. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992). However, if an ambiguity exists in a provision of a policy, that provision is interpreted in favor of the insured. *See Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 486 (5th Cir. 1996).

III

In the part of the policy that covers property loss due to employee dishonesty, Potomac promises to pay Lynch Properties for

5

the loss of Covered Property resulting directly from a Covered Cause of Loss. "Covered property" is defined as money, securities, and property other than money and securities. The "covered cause of loss" is defined as employee dishonesty. However, another provision, the "Interest Covered" provision, limits property loss coverage to property (a) "[t]hat you own or hold," or (b) "[f]or which you are legally liable," with "you" being the named insured, Lynch Properties.

The district court found that the employee dishonesty policy was not ambiguous and that the "Interest Covered" provision excepted this particular loss from coverage under the policy because Lynch Properties neither owned, held, nor was legally liable for the funds. It found the connection between Lynch Properties and the funds in Mrs. Lynch's personal accounts to be tenuous, specifically finding that these funds were private, in Mrs. Lynch's name, and completely separate from the funds that Lynch Properties maintained in its own accounts. Moreover, it found that no written agreement for management of the separate personal bank accounts existed, and that Mrs. Lynch's arrangement with Lynch Properties was based on family ties. As a result, the court concluded that "the capacity in which Lynch handled Ms. Lynch's funds falls short of that involved in the cases Lynch cites to demonstrate that the 'hold' or 'legally liable' provisions trigger coverage in this case." We agree.

A

We first examine whether Lynch Properties "held" the funds

6

that Bartlett misappropriated from Mrs. Lynch's separate personal bank accounts. Lynch Properties presents numerous cases that it claims stand for the principle that employee dishonesty policies cover the loss of third-party property possessed or held by the insured by an employee. The policy language or manner in which the property was possessed or held in each cited case differs, however, from that in this case. *See Fidelity & Deposit Co. v. USAFORM Hail Pool, Inc.*, 523 F.2d 744, 753-54 (5th Cir. 1975) (involving funds held in a trust account); *Elmer Fox & Co. v. Commercial Union Ins. Co.*, 274 F. Supp. 235, 239-40 (D. Colo. 1967) (interpreting an employee dishonesty policy that covered property "held by the Insured in any capacity"); *Alberts v. American Cas. Co.,* 200 P.2d 37, 39-41 (Cal. Ct. App. 1948) (interpreting a contract that covered any case in which insured might be liable as "bailee, trustee or agent, and whether or not the plaintiffs are legally liable for the loss thereof"); *American Employers' Ins. Co. v. Johnson*, 47 S.W.2d 463, 464, 466 (Tex. Civ. App. 1932, writ dism'd w.o.j.) (interpreting policy that covered any "pecuniary loss . . . (including that for which the Employer is responsible) by any act or acts of fraud, . . . [or] embezzlement"). Whether the Potomac policy covers Bartlett's misappropriation of funds from Mrs. Lynch's personal bank accounts must be answered by reference to this contract's specific language that defines the property covered. *See Cumis Ins. Soc'y v. Republic Nat'l Bank*, 480 S.W.2d 762, 766 (Tex. Civ. App. 1972, writ ref'd n.r.e.).

Potomac's policy uses only the word "hold" in place of the

broad language in the above cases.  While no Texas court has addressed the meaning of "hold" without the accompanying phrase "in any capacity," *see Cumis Ins. Soc., Inc.*, 480 S.W.2d at 763 (interpreting a contract which covers for the loss of property which is "held by the Insured in any capacity, and whether or not the Insured is liable therefore"), Financial Institution Bond, Standard Form No. 24, the industry standard form issued by the Surety Association of America on which this policy is based, provided a broad definition of property coverage in the version published in 1969.[1]  By 1980, the Surety Association had

_____

[1]    The 1969 version of Standard Form 24 provided coverage in relevant part for:

> (A) Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees, of property held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

Karen Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When is Third Party Recovery Allowed?*, 25 Tort & Ins. L. J. 92, 99 (1989).  Property was defined by the 1969 bond as "[m]oney . . . and all other instruments . . . in which the Insured has an interest . . . or which are held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefore."  *Id*. at 93.  The 1980 version of Standard Form 24 amended this language to cover only:

> Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable.  This bond shall be for the sole use and benefit of the Insured named in the Declarations.

*Id*. at 94. Significantly, this definition of property omitted all mention of property "held by the Insured for any purpose." *Id. at 94.* Standard Form 24 was again altered in 1986, but the provisions relating to property described above were not changed.  *Id*. Potomac's policy is even more restrictive than the 1986 version of Standard Form 24 because it has omitted "in any capacity" that

**8**

significantly limited property coverage by means of restricting the definition of "Interest Covered."  These changes reflect, as several commentators have noted, an intent to restrict coverage. *See* Karen Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When is Third Party Recovery Allowed?*, 25 TORT & INS. L. J. 92, 93-94 (1989); Duncan L. Clore, *Suits Against Financial Institutions: Coverage and Considerations*, 20 FORUM 84, 85-86 (1984).  Therefore, we reject Lynch Properties' argument that the scope of the word "hold" is equivalent to the phrase "hold in any capacity," and as such, we do not find the cases Lynch Properties presents to be persuasive.

Lynch Properties' citation to cases mentioning bailment suggests that it believes that a bailment arrangement is one way in which it might have "held" Mrs. Lynch's misappropriated funds.[2] *See, e.g.*, *American Empire Ins. Co*, 408 F.2d at 77.  On the facts of this case, however, Lynch Properties never had a bailment over the cash or the funds in those accounts.  Under Texas law, the elements of a bailment are: (1) delivery of personal property by one person to another to be used for a specific purpose; (2) acceptance of such delivery; and (3) an express or implied contract that the purpose will be carried out and the property will then be

---

previously followed "hold."

[2]    Although an insured may very well "hold" property in ways other than a bailment))an issue about which we decline to speculate))Lynch fails to suggest any other way it may have "held" either the cash or the funds in the account under these facts. Accordingly, we limit our discussion of the term "hold" to bailment.

returned or dealt with as otherwise directed. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1038 (5th Cir. 1987). Assuming bank accounts are personalty, Mrs. Lynch never "delivered" her personal bank accounts to Lynch Properties because they remained listed in her name at the bank, which means that no bailment existed over the accounts or the funds in the accounts. Furthermore, Bartlett's physical possession of the cash did not result in Lynch Properties "holding" the cash because no bailment existed with respect to Bartlett's wrongful physical possession of cash from Mrs. Lynch's personal bank accounts. When Bartlett intended to wrongfully take funds from Mrs. Lynch's personal bank accounts, she always accomplished this act by having Harry Lynch sign an extra check. No evidence exists in the summary judgment record that when Bartlett cashed that extra check, she took that cash with the intention of returning it to Mrs. Lynch. Thus, no bailment resulted, and Lynch Properties did not "hold" the cash as a result of Bartlett's wrongful possession of that cash.

Lynch Properties also argues that it "clearly held" the checks that Bartlett took but fails to explain why the loss of the checks should be equated with the loss of the funds from Mrs. Lynch's personal bank accounts. By arguing that it "held" the checks, Lynch Properties is in effect arguing that an employee's theft of property that an employer does not "hold" using property that an employer "holds" causes the employer to constructively "hold" property that it otherwise would not "hold." Lynch Properties cites no authority to support its argument, and indeed it could not

**10**

on the facts of this case. *See Texas Pac. Indem. Co. v. Atlantic Richfield Co.*, 846 S.W.2d 580, 530 (Tex. App. 1993, writ denied) (explaining that the coverage of an employee dishonesty policy "cannot be extended by implication, or enlarged by construction, beyond the actual terms of the agreement entered into by the parties"). Only Martha, Harry, and Bill Lynch had signature authority on Mrs. Lynch's separate personal bank accounts. Bartlett did not simply wrongfully take a check and cash it. Rather, she prepared an extra check and had Harry Lynch sign it. Lynch Properties also failed to adduce any evidence that Harry Lynch signed checks on Mrs. Lynch's personal bank accounts as Lynch Properties' representative and not as Martha Lynch's son. As the district court noted, this family authorization requirement evidences the tenuousness of the connection between Lynch Properties as the insured company and the funds in Mrs. Lynch's personal bank accounts. Accordingly, even though Lynch Properties had possession of the checks, the possession of those checks did not result in it "holding" the funds in Mrs. Lynch's personal bank accounts or the cash from those accounts.

Pointing to several portions of the deposition of Darryl Davis, a Potomac supervisor whom Potomac designated as its representative for purposes of its deposition, Lynch Properties also argues that Potomac admitted that Lynch Properties "held" the funds in Mrs. Lynch's personal accounts. We have reviewed the deposition and do not find any specific testimony that could be construed as Davis admitting that Lynch Properties "held" the funds

**11**

in Mrs. Lynch's personal bank accounts.  Accordingly, we reject this contention by Lynch Properties.

B

Turning to the "legally liable" provision, we again note that the parties have not brought to our attention relevant cases. Lynch Properties presents various cases that interpret fidelity bonds and employee dishonesty insurance policies that cover "whether or not the Plaintiff is legally liable." *See USAFORM Hail Pool, Inc.*, 523 F.2d at 752-53 (interpreting policy that provided coverage where "the Insured property may be owned by the Insured or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be as respects which the Insured is legally liable"); *American Employers Ins. Co.*, 47 S.W.2d at 464-65 (interpreting policy which covered "money or other personal property (including that for which the Employer is responsible)").  We do not find these cases to be persuasive because when the Surety Association of America altered Standard Form 24, on which Potomac's policy is based, by replacing "whether or not the Plaintiff is legally liable" with "legally liable," it intended to narrow the coverage of the policy. *See* Wildau, *supra*, at 93-94; Clore, *supra*, at 84.

On the other hand, the cases that Potomac presents are irrelevant because they decide whether third parties have standing to directly bring suit against an insurer to recover for the loss of their property by an employee of the insured. *See 175 East 74th Corp. v. Hartford Accident & Indem. Co.*, 416 N.E.2d 584, 587-88

**12**

(N.Y. 1980); *Louisiana, Through Dep't of Transp. and Dev. v. Acadia Parish Police Jury*, 631 So. 2d 611, 614 (La. Ct. App. 1994). Such cases are irrelevant because Lynch Properties, the named insured, brings this action.

Employee dishonesty policies insure against the risk of property loss through employee dishonesty. *See 175 East 74th Corp.*, 416 N.E.2d at 587. Liability policies, by contrast, require an insurer to discharge an obligation of the insured to a third party for some act of the insured or its employee. *Id.* at 587. Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, *see, e.g., First Nat'l Bank v. Fidelity & Cas. Co.*, 634 F.2d 1000 (5th Cir. 1981), these polices do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees. *See Gulf Bldg. Servs. v. Travelers Indem. Co.*, 435 So. 2d 477, 479 (La. Ct. App. 1983) (holding that an employee dishonesty insurance policy did not cover damage to a customer's property resulting from a fire set by the insured's employee working in the customer's building). Mere insertion of the words "legal liability" into an employee dishonesty policy does not transform the policy into a liability policy. *See, e.g., Acadia Ins. Co. v. NcNeil*, 116 F.3d 599, 602-03 (1st Cir. 1997); *First Nat'l Bank v. Lustig*, 975 F.2d 1165, 1166-67 (5th Cir. 1992); *Anderson v. Employers Ins.*, 826 F.2d 777, 780 (8th Cir. 1987); *175 East 74th Corp.,* 416 N.E.2d at 587-88.

In this case, the policy stated "[t]he property covered under

**13**

this insurance is limited to property . . . for which you are legally liable." Lynch Properties argues that it was legally liable for the misappropriation because Bartlett was responsible for writing checks, having Harry Lynch sign them, and balancing Mrs. Lynch's separate personal accounts. It does not argue, however, that it was legally liable for the funds prior to their theft. Instead, it argues only that once Bartlett misappropriated the funds, it became liable to Mrs. Lynch to replace those funds and that Potomac must indemnify it for that reimbursement because Bartlett stole the funds in the course of her duties at Lynch Properties. While Lynch Properties thereby argues how it may be vicariously liable for Bartlett's acts,[3] this argument fails to show how it was "legally liable" for the stolen property itself, that is, for the funds in Mrs. Lynch's account. Acceptance of Lynch Properties' argument would mean that Potomac's policy would cover any loss where an employee takes a customer's property in the course of their employment responsibilities, regardless of whether the employer had any interest in the property itself. Furthermore, it would transform this policy, which insures *property loss* for which Lynch Properties is legally liable, into a policy insuring any vicarious liability arising from an employee's dishonesty. This argument is foreclosed by the plain language of the "Interest

---

[3] We express no opinion as to whether Lynch Properties or Bartlett would be liable to Mrs. Lynch for Bartlett's misappropriation of money. Lynch Properties has reimbursed Mrs. Lynch for the missing money, and this issue is not before us. We merely hold that the words "legally liable" refer to the property interest that Lynch Properties must have to trigger coverage under the employee dishonesty policy.

14

Covered" provision, which requires that the employer have some interest in the misappropriated property, whether that be because the employer owns, holds, or is legally liable for the property. *Cf. Hudiburg Chevrolet, Inc. v. Globe Indem. Co.*, 394 S.W.2d 792 (Tex. 1965) (holding that insurance contract provisions that cover property at a specified location for which the insured is liable insure against loss of the property and do not indemnify the insured against tort or contractual liability to the owner of the property).

Our conclusion is reinforced by the fact that the employee dishonesty insurance policy under which Lynch Properties seeks indemnification is part of a master policy issued by Potomac. This master policy includes both liability and property coverage. Under the liability part of the policy, Potomac agrees to pay amounts for which Lynch Properties is legally liable. Liability coverage is triggered by an "occurrence," which the policy defines as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Under Texas law, intentional and volitional acts are not "occurrences" that can trigger liability coverage. *See Union Mut. Ins. Cos. v. Stotts*, 837 F. Supp. 814, 816 (N.D. Tex. 1993); *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex. 1973). Similarly, under the property coverage, section III.F of the "Special Extended Coverage Endorsement" specifically excludes losses "caused by any willful or dishonest act or omission of the Insured or . . . any employee of any Insured." Without deciding the applicability of either of

**15**

these policies, the existence of these other parts of the master policy indicates that the words "legally liable" in the "Interest Covered" provision of the employee dishonesty policy were intended only to limit the property that would be covered under that policy, and not to extend coverage to the theft of customer property by the insured's employees where the insured has no interest in the misappropriated property.

### III

In light of our conclusion that Mrs. Lynch's misappropriated funds do not fall within the "Interest Covered" under the employee dishonesty policy issued by Potomac, we decline to address the other grounds on which the district court based its decision. Furthermore, because Potomac accordingly had a reasonable basis on which to deny Lynch Properties' claim, we affirm the district court's denial of Lynch Properties' extra-contractual state law claims for failure to pay Lynch Properties' claim. *See Aranda v. Insurance Co.,* 748 S.W.2d 210, 213 (Tex. 1988).

For the foregoing reasons, the decision of the district court is AFFIRMED.