SUTTON, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. COOK, J. (pp. 274-79), delivered a separate opinion.
OPINION
SUTTON, Circuit Judge.
This insurance-coverage dispute arises from a policy designed to protect financial institutions from losses caused by dishonest employees. Trying to recover nearly one million dollars stolen by an employee from client brokerage accounts, three financial institutions sued the insurance company that issued the policy. The district court held that the policy covered the losses and granted summary judgment to the financial institutions. We affirm the court’s liability judgment and all but one of its damages calculations.
I.
First Defiance Financial Corporation is a bank-holding company. It owns First Federal Bank of the Midwest, a traditional bank, and First Insurance and Investments, an investment firm. All three financial institutions, collectively First Federal, were designated as insureds under a fidelity insurance policy issued by Progressive Casualty Insurance Company. The policy insured against “[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others.” R.39-2 at 42. The policy defined “employee” to include “a [d]ual [ejmployee who is ... a registered representative of a third-party broker/dealer ... in addition to his or her employment by the [ijnsured.” Id. at 43.
Jeffrey Hunt was a dual employee of First Defiance and a third-party broker-dealer, Online Brokerage Services. As an investment advisor, he managed discretionary brokerage accounts for First Defiance’s clients by selecting stocks, bonds and other investments for them. Hunt traded securities through Online Brokerage Services. A third institution, National Financial Services, held each client’s assets in individual accounts accessible only to First Defiance’s investment advisors in their dual role as an advisor and broker. When clients opened these accounts, they directed National Financial Services as follows: “I (we) have instructed My Broker/Dealer to establish, in my (our) behalf, and as my (our) agent an account with you. I (we) have appointed My Broker/Dealer as my (our) exclusive agent to act for and on my (our) behalf with respect to all *268 matters regarding my (our) account with you.” R.39-6 at 5.
In April 2007, First Defiance learned that Hunt had transferred money from his clients’ brokerage accounts to his own bank account. Id. at 4-5. Nineteen of First Defiance’s clients lost $859,213.35 from Hunt’s theft. First Defiance reimbursed the stolen money and an additional $72,707.96 to cover lost interest and unrealized client income. All told, First Defiance paid $931,921.31 to its clients to cover the defalcation.
In addition to its policy with Progressive, which had a $125,000 deductible, First Defiance held a no-deductible fidelity policy with the Cincinnati Insurance Company to cover employee-dishonesty losses up to $50,000. Cincinnati Insurance paid $50,000 for the financial institutions’ losses stemming from Hunt’s fraud.
First Defiance filed a proof of loss with Progressive, claiming $907,597.23 in covered losses. R.46-1 at 79. Progressive denied the claim, and First Defiance filed this lawsuit in state court, which Progressive removed to federal court. The district court held that First Defiance’s losses were covered under the policy as a matter of law and awarded $564,006.75 to it. Progressive appeals the district court’s liability ruling and part of its damages ruling. First Defiance cross-appeals other components of the damages ruling.
II.
The liability appeal implicates three requirements under the insurance policy: (1) whether the stolen money was “covered property”; (2) whether Hunt’s theft caused a “direct loss” to the banks; and (3) whether Hunt committed his dishonest acts “with the manifest intent” to cause the loss. R.39-2 at 42. First Defiance meets each one.
Covered Property. The policy covers “loss of [property (1) owned by the [i]nsured, (2) held by the [ijnsured in any capacity, or (3) owned and held by someone else under circumstances which make the [i]nsured responsible for the [p]roperty prior to the occurrence of the loss.” R.39-2 at 19. The theft does not meet the first definition, as Hunt stole client funds, not First Defiance’s funds, not in other words funds “owned” by the insured. Hunt was not trading with house money.
The stolen assets may well satisfy the second definition of “property,” as First Defiance “held” the property for its clients and seems to meet the modest requirement of doing so “in any capacity.” But we need not resolve the point, as the assets readily meet the third definition.
At the time of the theft, National Financial, a custodian bank, owned the assets and held them for First Defiance’s clients. That surely counts at a minimum as property “owned and held by someone else.”
The property likewise was held “under circumstances that make the insured responsible for the property.” Why? By their terms, these were “discretionary” accounts, meaning that First Defiance had authority over them within the general and specific limitations set by each client. R.46-1 at 66-67. In view of the nature of these discretionary accounts, First Defiance and its employees owed a fiduciary duty to their clients — to look after their clients’ interest ahead of their own — a first prerequisite of which was not to take the funds for themselves. See R.46-1 at 66; see generally SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).
First Defiance’s fiduciary responsibility also arose “prior to the occurrence of the loss.” The duty was prospective, requiring the bank to manage the assets for the *269 client’s benefit from the moment the fiduciary relationship was formed and from the moment the clients gave the funds to the bank. See R.46-1 at 66; Capital Gains Research Bureau, 375 U.S. at 191, 84 S.Ct. 275. In opening an account, clients agreed to appoint an investment advisor, jointly employed by First Defiance and a third-party broker-dealer (here Hunt), as the “exclusive agent to act for and on my behalf with respect to all matters regarding my account.” R.39-6 at 5; see also R.46-1 at 67 (“Client authorizes [ajdvisor to give [cjustodian instructions for the purchase, sale, conversion, redemption, exchange or retention of any security, cash or cash equivalent or other investment for the [ajccount.”) Clients instructed National Financial to look “solely to my broker/dealer and not me with respect to ... orders or instructions ... and to deliver confirmations, statements, and all written or other notices ... to my broker/dealer.” R.39-6 at 5. That First Defiance, as opposed to National Financial, updated clients with quarterly account statements proves the point. What financial institution sends account statements to clients for money for which it is not responsible?
The straightforward words of this definition of “covered property” show that it applies to Hunt’s defalcation. So too does an exclusion from coverage in the same policy. The policy excludes coverage for “loss[es] resulting ... from transactions in a customer’s account ... except the unlawful withdrawal and conversion of [m]oney ... from a customer’s account by an [e]mployee provided such [loss] is covered under [the rest of the policy].” R.39-2 at 43 (emphasis added). The policy thus excludes general losses from customer-account transactions but exempts from the exclusion any “unlawful withdrawal and conversion.” Why add this language if the policy does not cover employee thefts of this sort? Progressive has no answer. And we cannot identify one on our own.
Progressive insists that First Defiance was not responsible for the money because every client signed a disclosure form recognizing that First Defiance could not make any guarantees about the brokerage accounts. But the disclosure form disclaims liability for market losses, not losses through a breach of fiduciary duty or for that matter outright theft. The form concerns the “separation of traditional bank accounts and the new brokerage account being established.” R.39-7 at 2. It informs clients that their brokerage accounts are not FDIC-insured, are not bank deposits, “are not guaranteed by the bank,” and “are subject to market risk, including the possible loss of the principal invested.” Id. All of this tells the client that the principal in a brokerage account is not guaranteed in the way that the principal in a traditional bank account is. None of it undermines First Defiance’s responsibility to its clients as a fiduciary or permits First Defiance’s employees to embezzle client funds.
Progressive adds that because the client contracts did not establish “liability” before the loss, First Defiance could have incurred liability only after Hunt stole the money, giving rise at most to a potential tort claim against the bank and at most to the possibility of liability after the loss. This argument has several flaws. The definition applies to “responsibility” before the loss, not to liability. The fiduciary relationship between First Defiance and its clients, which pre-dated the thefts, made First Defiance responsible for transactions undertaken with a client’s money from the moment the fiduciary relationship was formed. If adopted, moreover, Progressive’s approach would convert this definition of covered property into empty words, signifying little if indeed anything *270 at all. The point of the provision is to reach property not owned and not held by the insured but for which the insured is responsible nonetheless. That responsibility need not be established by a tort verdict, which necessarily cannot happen before the theft; it can be established by the terms of the account between the bank and the client and the fiduciary duties that spring from them. We break no new ground in holding that fiduciaries bear responsibility for thefts from client accounts, as opposed to the inevitable swings in the market to which all investors are exposed. Acceptance of the risk of market fluctuations does not include acceptance of the risk of theft.
The brokerage agreements, it is true, do not spell out First Defiance’s responsibility by saying, for example, “If instead of investing your money our employees steal it from you, we will return the money.” But that understandable reality is not a deal breaker. The absence of such language does not disprove that the nature of the relationship — a fiduciary one — itself established this responsibility before the loss. It would be remarkable, at any rate, to insist on such language. We doubt that such language ever appears in brokerage agreements for the same reason other contracts do not spell out like-minded guarantees implicit in other transactions: A grocery receipt does not spell out the store’s obligation to refund the price of food poisoned by a disgruntled employee; a plane ticket does not detail the airline’s responsibility to refund the ticket price if a rogue pilot flies the plane to the wrong destination; and a restaurant does not promise to repay a customer if a waiter double-charges for a meal.
Direct loss. Progressive submits that Hunt did not “directly” cause the plaintiffs’ losses because he stole money from customer accounts, not from the financial institutions themselves. This is a variation on a just-rejected theme. The “property loss” covered by the policy, as shown, includes assets “held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss.” R.39-2 at 19 (emphasis added). If property qualifies as “covered property,” and a dishonest employee steals it, the employee “directly” causes the loss. It is as simple as that, and that is true under any definition of “directly.” It thus makes no difference whether the phrase “direct loss,” as used in most fidelity insurance policies, establishes a proximate cause standard or something more exacting, compare, e.g., Scirex Corp. v. Fed. Ins. Co., 313 F.3d 841, 850 (3d Cir.2002) (applying proximate cause test) with Vons Cos., Inc. v. Fed. Ins. Co., 212 F.3d 489, 491-93 (9th Cir.2000) (purporting to apply a stricter standard and stating that “direct means direct” cause), or indeed whether the distinction between direct cause and proximate cause is a meaningful one, Staub v. Proctor Hosp.,—U.S.-, 131 S.Ct. 1186, 1192, 179 L.Ed.2d 144 (2011) (questioning the distinction and noting that proximate cause itself “requires only some direct relation between the injury asserted and the injurious conduct alleged” (emphasis added)).
Progressive’s long list of citations does not refute the point. The unifying theme of its authorities is that losses contingent on things other than an employee’s fraud are not “direct” under most fidelity policies. See Vons Cos., 212 F.3d at 490-92 (no direct loss where insured settled with third parties who lost money in part because of an employee’s dishonest representations to them); Universal Mortg. Corp. v. Wurttembergische Versicherung AG, 651 F.3d 759, 764 (7th Cir.2011) (no direct loss where insured’s losses were due to buy-back provisions in sales contracts for *271 fraudulent loan packages, not employee dishonesty in making sub-standard loans); RBC Mortg. Co. v. Nat’l Union Fire Ins. Co. of Pittsburgh, 349 Ill.App.3d 706, 285 Ill.Dec. 908, 812 N.E.2d 728, 735 (2004) (same); Tri City Nat’l Bank v. Fed. Ins. Co., 268 Wis.2d 785, 674 N.W.2d 617, 626 (App.2003) (no direct loss where employee’s dishonesty led third parties to make bad loans and sue the insured when the borrowers defaulted).
No such contingency exists here. Hunt stole client money. The only question is whether it was “covered property” under the policy. It was. All of these cases are beside this fundamental point.
Nor does Lynch Properties, Inc. v. Potomac Insurance Company of Illinois, 140 F.3d 622 (5th Cir.1998), solve this problem. A bookkeeper misappropriated funds from the personal bank accounts of Mrs. Lynch, the mother of the president of Lynch Properties. Id. at 625. Lynch Properties had no relationship to Mrs. Lynch’s personal accounts, which she kept at other financial institutions and which had no connection to the company. Id. The company sued to recover Mrs. Lynch’s lost funds from a fidelity insurance policy that covered losses to property “for which [Lynch Properties] is legally liable.” Id. at 627. The Fifth Circuit held — correctly, we might add — that the policy did not apply because it did not “extend coverage to the theft of customer property by the insured’s employees where the insured has no interest in the misappropriated property.” Id. at 630. Not so here.' First Defiance contracted with its clients to manage their investment accounts as a fiduciary, which not only gave them an interest in the misappropriated property but also made them responsible for it.
Manifest intent. That leaves one other question under the policy: Did Hunt have a “manifest intent” to cause First Defiance a loss? The phrase does not establish a subjective standard; it establishes an objective one, meaning “apparent or obvious.” FDIC v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1035 (6th Cir.1991). An insured meets the requirement where “a particular result is substantially certain to follow from conduct.” Peoples Bank & Trust Co. v. Aetna Casualty & Surety Co., 113 F.3d 629, 634 (6th Cir.1997). That was assuredly true here. In view of the fiduciary relationship between First Defiance and its clients, a theft from client accounts by a First Defiance employee would be substantially certain to cause losses to the bank.
Nor was there any way Hunt’s fraud could benefit the employer. See St. Paul Fire, 942 F.2d at 1036. “Embezzlement is a zero-sum game. For the employee to win, the employer must lose.” Id. Just as there are no free lunches from an economist’s perspective, there are no free thefts from a bank’s perspective. Hunt stole client money, and the terms of the client accounts and the underlying fiduciary duties arising from them made First Defiance responsible for paying it back.
Neither is this a circumstance involving a damages contingency, as when an employee makes bad loans and no loss occurs until the loans fail. See Peoples Bank, 113 F.3d at 634. First Defiance gave Hunt access to its clients’ assets for investment purposes, but he pocketed the money instead. It was “substantially certain,” indeed absolutely certain, that his employer would incur a loss as a result of this misappropriation of client funds.
The dissent worries that our decision “negates the ‘prior to the occurrence of the loss’ limitation” on fidelity bond coverage. Not so. First Defiance became “responsible” for money in its customers’ accounts when they opened their accounts and ap *272 pointed a First Defiance advisor to select and execute their investments, long before — prior to — the loss of some money in those accounts caused by Hunt’s theft.
Nor, to obtain coverage, must First Defiance point to a provision of the brokerage accounts that uses the words “fiduciary” or “responsible.” The language of the insurance contract explains why. The policy covers property “owned and held by someone else under circumstances which make the insured responsible” for the property. R.39-2 at 19 (emphasis added). That the (fiduciary) circumstances of this discretionary account make First Defiance responsible for its employee’s theft of its clients’ funds hardly construes “responsibility” too “broadly.” Dissent at 275. The search for a (remarkable) disclaimer that customers “assume the risk of employee theft” is a strawman of the dissent’s own making. Id. at 275 n. 1. Neither the one (you are on your own if our employees steal your money) nor the other (we will pay you back for such thefts) customarily (if ever) appears in such contracts, and this insurance policy not surprisingly did not demand the one or the other. The policy says only that the “circumstances” of the relationship must make the insured “responsible” for the money before the theft. Asked and answered.
The dissent’s discussion of the drafting history of these bond provisions is a distraction, relevant only to other interpretive issues raised with respect to these contracts, not to the issues dispositive here. The premise of the discussion is a series of one-off cases that do not involve employee thefts from fiduciary accounts for which the insured is responsible from the moment the funds are placed in the account, which is to say long before the theft. Emblematic of the problem is the dissent’s discussion of Lynch. To repeat, the insured in that case had no responsibility for the outside, embezzled accounts, while First Defiance created the accounts for its customers and was accountable for the money in them from the get-go. That presumably is why the insured in Lynch “d[id] not argue ... that it was legally liable for the funds prior to their theft” but that it was “vicariously liable” for its employee’s acts with respect to property held by others and for which it had no responsibility. 140 F.3d at 629. How then did the insured in Lynch have “at least as much responsibility for the customer ... accounts],” Dissent at 276-77, as First Defiance had here? I do not know.
III.
Progressive argues that the damages award was too high — that it improperly permitted a $57,084.51 recovery for lost interest. The policy, it points out, excludes coverage for “potential income, including but not limited to interest and dividends, not realized by the Insured.” R.39-2 at 14. The exclusion speaks to lost interest not realized by the insured, not to interest payments owed to customers. The interest payments owed to First Defiance’s customers were not income to First Defiance; they were unpaid liabilities. That is why Progressive’s case citations do not aid their cause; they address lost future income to the insured. See, e.g., First Am. State Bank v. Cont'l Ins. Co., 897 F.2d 319, 329 (8th Cir.1990) (excluding coverage for future interest payments not yet owed to the insured); U.S. Gypsum, Co. v. Ins. Co. of N. Am., 813 F.2d 856, 857-59 (7th Cir.1987) (excluding coverage for lost income caused by theft of a trade secret). The district court properly included this money in the damages award.
First Defiance submits that the damages award was too low. It argues that the district court should not have deducted its $202,779 settlement with On *273 line Brokerage Services from the damages award but should have applied it against the deductible. The settlement agreement proves otherwise. It says that the settlement money “reflects [First Defiance’s] losses attributable to” these brokerage customers and that “[First Defiance] shall not be entitled to make any further recovery from Progressive on account of’ those customers. R.54-1 at 3. It adds that “Progressive and [First Defiance] expressly reserve for the [c]ourt ... any dispute concerning how the [settlement payment] shall be applied for purposes of calculating the amount, if any, subject to coverage under [Progressive’s policy].” Id.
First Defiance does not dispute that the district court’s method of calculation was one reasonable way of ensuring that the bank did not receive additional recovery from Progressive on account of losses covered in the settlement agreement. See Second Br. at 53-55; Fourth Br. at 3-11. Its only complaint is that there was another way, one that is more equitable in its view. But the terms of the settlement reserve that fair-minded judgment to the trial court, not to First Defiance. The district court reasonably concluded that the policy required the deductible and the Online Brokerage Services settlement to be deducted from Progressive’s liability. We agree, and we agree that this is the most equitable allocation of the losses.
The district court separately reduced First Defiance’s recovery by $50,000 because the bank received that amount from Cincinnati Insurance based on another employee-dishonesty policy. First Defiance disagrees with the district court’s adjustment, and respectfully so do we. One premise of the district court’s adjustment is correct: “Where two insurance policies cover the same risk” and both claim to be “excess insurance over other valid, collectible insurance,” Ohio courts apportion liability between both insurers according to the limits of their respective policies. Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co., 49 Ohio St.2d 213, 361 N.E.2d 1052, 1052 (1977). But another premise is not: The rule applies only where the two policies cover the same risk. Id. (two policies applied to same vehicle accident); Cincinnati Ins. Co. v. Motorists Mut. Ins. Co., No. L-10-1095, 2010 WL 4157403 at *3-4 (Ohio Ct.App. Oct. 22, 2010) (same). When two policies claim to be excess over other policies insuring the same risk, a judgment enforcing the excess provisions in both policies would leave the insured with no coverage. Buckeye Union, 361 N.E.2d at 1054. Prorating in those circumstances “honor[s] the expectations of policyholders that they receive protection” while “still giv[ing] at least partial effect to the insurer’s intent to escape primary liability.” Id.
None of these concerns applies here, however. The two policies insure against two different levels of risk: Cincinnati’s policy covered losses from $0 to $50,000, R.46-1 at 82, while Progressive’s policy covered losses from $125,000 (the deductible) to $9,000,000 (the policy limit), R.39-2 at 2. Cincinnati’s policy thus provided primary coverage for the first $50,000 of loss, and Progressive’s policy provided excess coverage for losses exceeding $125,000. That means First Defiance may recover under each policy without recovering twice for the same loss. Under these circumstances, it makes little sense to apply Cincinnati’s excess-insurance provision, because Cincinnati’s policy could never provide excess coverage to Progressive’s policy, which covered losses well over Cincinnati’s coverage limit. See Ed E. Duncan, Ohio Insurance Coverage § 8:4 (2011) (“[o]ther [insurance clauses only come into play ... where coverage is provided by all insurers on the same lev *274 el”). All of this presumably explains why Cincinnati Insurance saw no conflict between the two policies and paid First Defiance up to the limit of its policy without enforcing its excess insurance clause.
The valuation clause in Progressive’s policy does not change things. It provides that “[t]he value of any loss for purposes of coverage ... shall be the net loss to the Insured after crediting any receipts, payments or recoveries ... received by the Insured in connection with the transaction giving rise to the loss.” R.39-2 at 17. It goes on to address the valuation of losses derived from money, securities, records, accounting books or other property. Id. Read in context, the provision has nothing to do with money recovered from other insurance policies, and we see no reason to read such a meaning into the provision when a separate section of the policy addresses “other insurance or indemnity.” Id. at 19. Progressive is not entitled to credit Cincinnati Insurance’s payment against First Defiance’s recovery.
IV.
For these reasons, we affirm the district court’s liability ruling and its damages ruling in all respects but one; we reverse the decision to subtract the Cincinnati Insurance $50,000 pay-out from the damages award. The case is remanded for further proceedings.