UNITED STATES GYPSUM COMPANY,
Plaintiff-Appellant,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Defendant-Appellee.

No. 86–1589.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1986.

Decided March 12, 1987.

James M. Hofert, Kezelis, French, Rogers, Kezelis & Kominiarek, Chicago, Ill., for plaintiff-appellant.

Thomas A. Doyle, Baker & McKenzie, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge,
POSNER, Circuit Judge, and
ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

United States Gypsum Company's comprehensive crime insurance contract with Insurance Company of North America ("ICNA") specifically excluded coverage for a loss of "potential income." An employee of Gypsum leaked a Gypsum trade secret to another company, which used the trade secret to manufacture sealant that it sold to a sealant customer of Gypsum. Gypsum claimed a loss, in the amount of gross revenue made on the sealant by the other company. ICNA refused to pay, on the grounds that the loss was a loss of "potential income." Gypsum sought a declaratory judgment in this diversity action that it was entitled to payment. The trial court granted summary judgment for ICNA. We have jurisdiction under 28 U.S.C. § 1291. We will affirm.

## I

The facts here are not disputed. Gypsum was the only seller of a sealant called "BISCO Seal" ("BISCO"). BISCO is used in nuclear power facilities. Gypsum had a complete monopoly on the sale of this type of sealant because Gypsum was the sole possessor of the formula necessary to the production of BISCO. No other manufacturer offered a product which could be used in place of BISCO. The formula was a product which could be used in place of BISCO. The formula was a trade secret of Gypsum. An employee of Gypsum, Robert Banks, shared the formula with a company called O.K. Adhesives. In so doing, Banks violated a promise in his employment agreement to keep Gypsum's trade secrets confidential. O.K. Adhesives made $139,298.58 in gross revenue from sales of bogus BISCO.

Gypsum had an insurance contract with ICNA which covered, among other things, "Loss of Money, Securities and other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the employees, acting alone or in collusion with others." Gypsum filed a proof of loss statement for the amount that O.K. Adhesives received in revenue from sales of the sealant. We assume here, as did the parties, that the aforementioned clause covers the loss of $139,298.58.

ICNA denied coverage for the loss on the basis of a clause in the insurance contract that excluded coverage for "potential income":

[T]he Company shall not be liable under any Insuring Agreement for:

(i) Potential income, including but not limited to interest and dividends, not realized by the Insured because of a loss covered under this Policy.

Gypsum's amended complaint in count one sought a declaratory judgment that ICNA was obligated to pay Gypsum $139,298.58 for "lost income caused by the theft of the trade secret," together with "interest on the lost income" since the filing of the proof of loss statement. The count also referred to the loss as "an actual loss of income." In a second count, Gypsum sought attorney's fees, costs, and one quarter of the claim, under the Illinois Insurance Code, Illinois Revised Statutes, Ch. 73,

§ 767, on the basis that ICNA's refusal to pay the claim was "vexatious and without reasonable cause."

The trial court granted summary judgment for ICNA. The court held that Gypsum's claim fell within the exclusion of "potential income." "This is the exact situation contemplated by the exclusion; potential income, not realized because of a loss under the policy." Gypsum appeals that holding. On appeal, Gypsum has not pursued its claim for statutory penalties for baseless and dilatory denial of a claim.

## II

Gypsum argues as follows: Gypsum protected itself with insurance against the loss of property through theft. Had Banks not stolen the trade secret from Gypsum, Gypsum would have made the $139,298.58 that O.K. Adhesives garnered. Thus the $139,298.58 of lost income is the "actual liquidated value" of the stolen trade secret, just as if Banks had taken $139,298.58 worth of BISCO.

Even if we follow Gypsum's hypostatization and treat the trade secret, a concept, like an object, theft is not the correct analogy. Banks did not deprive Gypsum of the trade secret. It is not as though Gypsum had a BISCO making machine and Banks stole it; it is as though Banks used the BISCO machine in his garage after work and sold the illicitly made BISCO. Gypsum still had the formula and the rights to it. Gypsum did not allege that the events caused Gypsum to lose the formula or the rights, through the formula becoming public, for example.

The machine analogy demonstrates that the loss was, as the district court held, precisely the sort of loss covered by the exclusion. If an employee stole Gypsum's sole BISCO machine, the policy would presumably cover the cost of the machine. But if it took Gypsum a year to replace the machine, the policy would not cover the sales of BISCO that Gypsum was unable to make during that year. Or if the machine was recovered in perfect condition before Gypsum replaced it, then ICNA would not be liable at all, although Gypsum had lost revenue. This analogy also highlights the purpose of the exclusion. Gypsum has the most control over how much it will suffer in the market as a result of the dishonesty of its employees. ICNA expressly declined to take on the risk of such losses, effectively forcing a strict duty of mitigation of such costs upon Gypsum. In the machine analogy, Gypsum must act quickly to replace the machine or face the loss of sales. In a case like the present, Gypsum must move to stop the sales of counterfeit BISCO.

One other court has had occasion to interpret the clause at issue under facts similar to the present and has reached the same conclusion we reach. *Bank of Huntingdon v. Smothers*, 626 S.W.2d 267 (Tenn.App.1981). There, to simplify somewhat, a bank employee had embezzled funds over a period of years by forging signatures to interest-bearing promissory notes and pocketing the proceeds. The bank sought coverage under an insurance contract substantially the same as the present one. The court agreed that the bank's "actual loss" from the employee's peculation was the total principal amount of the notes and the accrued interest. The interest, however, was excluded from coverage as "potential income." Although interest is specifically named as a type of revenue which might be "potential income," the court based its decision not upon that language but upon the character of the interest. It represented revenue that the bank would have received if the notes had not been forged. Thus, the insurance company was liable only for the "actual outgo," monies paid out of the bank's treasury to its disloyal employee. Had the employee in that case repaid the principal, the bank would have had no covered loss. In this case, that is effectively what happened. Gypsum still has the secret, but was deprived of the sales it should have made.

Every commercial asset represents "potential income" in the sense that, if it has value, it can be sold. This cannot be the meaning intended by the parties, since the contract would then cover few losses.

What the phrase means appears from the characterization "including but not limited to interest and dividends." This points to a line drawn between the asset lost and the income that might be made using that asset.

Gypsum's position could be interpreted to mean the following: the value of the trade secret derives from the amount of income it will bring Gypsum in the future. Because of the unauthorized use of the trade secret, Gypsum did not receive $139,298.58 of that income. Thus, the value of the secret has been diminished. Since the $139,298.58 would have been received in the year of the loss, rather than some future year, that is the amount of the diminution in value.

What this argument overlooks is that such a decrease in the value of the trade secret would have occurred regardless of who made the $139,298.58 in sales of BIS-CO. Had Gypsum itself made the sales, there would now be $139,298.58 less future sales to be made. The income-producing asset itself, the trade secret, remains unchanged. Gypsum's amended complaint did not allege that because of Banks's breach of confidence the trade secret is now any less useful in generating income. Gypsum alleged that it had lost income of $139,298.58. Recharacterizing that loss in this court as the "actual liquidated value" of the trade secret does not alter the fact that Gypsum did not allege facts to indicate that the trade secret lost its worth as an income-producing asset. Gypsum has the same rights in the formula as it had before. As tax lawyers know, "income" and "capital" are but rude conceptual categories. It is often difficult to determine how to characterize certain gains and losses. Here, however, it is clear that the contract marks the loss in question as one of "potential income … not realized by the Insured."

### III

For the reasons stated, the judgment of the district court is

AFFIRMED.