[No. B188740. Second Dist., Div. Eight. Mar. 13, 2007.]

SIMON MARKETING, INC., et al., Plaintiffs and Appellants, v.
GULF INSURANCE COMPANY et al., Defendants and Respondents.

COUNSEL

Michelman & Robinson and Catherine L. Rivard for Plaintiffs and Appellants.

Musick, Peeler & Garrett, Gilbert D. Jensen and Jennifer M. Kokes for Defendant and Respondent Federal Insurance Company.

Anderson, McPharlin & Conners, David T. DiBiase and Lisa Le Nay Coplen for Defendant and Respondent Gulf Insurance Company.

OPINION

**FLIER, J.**—Appellants Simon Marketing, Inc., and Simon Worldwide, Inc. (collectively Simon), brought this action against respondents Federal Insurance Company (Federal) and Gulf Insurance Company (Gulf) on insurance policies providing coverage for losses to property caused by theft or forgery committed by Simon's employees. Gulf and Federal moved for summary judgment on the ground that the policies did not cover the losses that Simon claimed to have incurred. The trial court granted the motions for summary judgment. We affirm.

## FACTS

### 1. The Underlying Facts

Simon performed promotional and marketing services for McDonald's Corporation; as part of these services, Simon designed promotional games for McDonald's and its franchisees, including "Who Wants to Be a Millionaire" and "Monopoly."

Jerome Jacobson, director of security for Simon, was responsible for the "seeding" of high-value winning game tickets across the nation in McDonald's giveaway contests from 1988 to 2001. Unbeknownst to Simon, Jacobson organized a network of accomplices and coconspirators to funnel high-value winning game tickets to specific individuals; according to Simon, Jacobson stole game pieces with a total redemption value of approximately $21 million. Jacobson received kickbacks from the winners. Jacobson was arrested along with others by the FBI in August 2001, ultimately pled guilty and was sentenced to prison.

### 2. The Gulf and Federal Policies

Gulf issued a policy to Simon that provided that Gulf "will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss," up to $500,000 and with a $15,000 deductible. "Covered Property" is defined under the policy as "[m]oney,"[1] "securities,"[2] and "property other than money and securities."[3] "Covered Cause of Loss" is defined as "Employee dishonesty." In turn, "Employee Dishonesty" is defined as dishonest acts committed by an employee that "(1) [c]ause you to sustain loss; and also [¶] (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or employee benefits earned in the normal course of employment) for: [¶] (a) The 'employee'; or [¶] (b) Any person or organization intended by the 'employee' to receive that benefit."

The Gulf policy specifically excludes the insured's "inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property," as well as "[p]ayment of damages of any type for which you are legally liable."

Federal issued a policy to Simon that is substantially the same as that issued by Gulf. The Federal policy provides in relevant part that Federal shall be liable for "direct losses of **Money, Securities** or other property caused by **Theft** or forgery by any **Employee** of any **Insured**." (Original boldface.) Money and securities are defined along the same lines as in the Gulf policy. Theft is defined as the unlawful taking of money, securities or other property to the deprivation of the insured.

The Federal policy contains a clause excluding loss of income that is the same as the corresponding clause in the Gulf policy. In addition, the Federal

---

[1] Money is defined as currency, coin and bank notes in current use and having a face value and as traveler's checks, registered checks and money orders.

[2] Securities is defined as negotiable and nonnegotiable instruments or contracts.

[3] Property, other than money or securities, is identified as any tangible property that has an intrinsic value.

policy excludes fees, costs and expenses incurred in prosecuting or defending legal proceedings. The policy also excludes any loss the proof of which involves a profit and loss comparison.

## 3. *Litigation*

Once Jacobson's machinations became known, litigation erupted that can be classified into four groups.

First, numerous consumer lawsuits were consolidated in the Circuit Court of Cook County, Illinois, which the parties refer to as the "Boland" litigation, and into a single California action. McDonald's entered into a settlement of the Boland litigation in April 2002, the terms of which are not material to this appeal. Also in April 2002, McDonald's and Simon's two error and omissions insurers entered into an agreement to fund the settlement; the two insurers agreed to fund the settlement as long as it did not exceed the $30 million combined policy limits of the two policies. Simon paid nothing to fund the settlement.

Second, after McDonald's terminated its contract with Simon, litigation ensued between Simon and McDonald's that was settled in July 2003. Under the settlement, McDonald's paid $6.9 million to Simon and assigned to Simon its rights to insurance proceeds. Simon collected $8.7 million from the assignment for a total of $15.6 million paid under the settlement with McDonald's.

Third, in August 2003 Stone Street Capital, Inc., the identity of which is not disclosed by the record, filed an action against Simon, McDonald's and a coconspirator of Jacobson in Maryland state court. Simon settled this case for $175,000 and paid the settlement.

Fourth, Simon claims that it incurred expenses ($50,000) in defending a class action suit in Canada.

## 4. *Simon's Statement of Its Damages in Its Discovery Responses, Simon's Concessions and the Trial Court's Ruling*

Simon described its losses, i.e., damages in responses to Gulf's and Federal's interrogatories. These two responses differ somewhat, and we summarize them below. In addition, Simon contended that it was "legally liable" for the game pieces that Jacobson stole and that, for this reason, the theft of these pieces was a covered loss under the policy. We deal with the contention predicated on the game pieces themselves in another part of this opinion. (See Discussion, pt. 2, *post*.)

(a) *Simon's Responses to Federal's Interrogatories*

Simon took the position that it lost its business as a result of Jacobson's fraud. Thus, Simon stated that its damages were: (1) the complete loss of its business, i.e., a sum in excess of $60 million; (2) out-of-pocket expenses of $38.6 million in winding down Simon; (3) payment of $175,000 to settle the Stone Street lawsuit; (4) defense costs in excess of $100,000 in the Canada class action and the Stone Street action; and (5) over $3 million in insurance proceeds that were paid in settlement of the class action, but that should have gone to Simon.

(b) *Simon's Responses to Gulf's Interrogatories*

Simon stated that its damages arose because Simon's professional liability insurers paid in excess of $15 million for replacement game prizes used in replacement games and additional sums for attorney's fees incurred due to the thefts by Jacobson. Simon did not receive $3 million from its own insurer, but allowed that sum to be paid to McDonald's. Simon also claimed $175,000 paid to settle the Stone Street litigation, and expended $50,000 in defense costs in the Canadian class action. "On top of all that, Jacobson's thefts directly precipitated the complete loss of Simon's business, worth an estimated $100 million, for which Simon has received little compensation."

(c) *Simon's Concessions*

In its response to Federal's statement of undisputed material facts, Simon stated unequivocally that "Simon is not seeking reimbursement for the value of the pieces of paper which were the winning game pieces." In another discovery response, Simon appears to have admitted that it is not seeking the value of the game pieces, as opposed to the "value of the pieces of paper."[4] This squares with the deposition testimony of the person designated by Simon as most knowledgeable, Terrence Wallock, who testified that Simon was not seeking compensation for the value of the prizes stolen by Jacobson.[5] The reason for this is that, while it is true that Jacobson stole high-value game pieces, once the putative "winner" presented the piece of paper, it was McDonald's who paid, and not Simon. This is a fact that Simon admits is undisputed.

---

[4] The record reference to this is an admission appearing in appellant's appendix. Apparently due to a clerical error, we do not have the actual request for an admission, but rather counsel's representation what the text of that request is. Simon does not contest that representation.

[5] In light of these admissions, there is a substantial question whether Simon is estopped to contend on appeal that the theft of the game pieces themselves was a covered loss. In light of our disposition of this argument (see text, *post*), it is not necessary for us to decide whether Simon is estopped to propound an argument that is contradicted by its own admissions in the trial court.

(d) *The Trial Court's Ruling*:

The trial court found that the policies provided coverage for "direct losses" caused by employee theft and did not cover the insured's vicarious liability for the tortious acts of its employee. The trial court relied on *Vons Companies, Inc. v. Federal Ins. Co.* (9th Cir. 2000) 212 F.3d 489, 491–492, a decision that held that employee dishonesty policies insure against the risk of property loss through employee dishonesty, and that such policies are not liability policies that discharge the insured's duty to a third party. Citing the litigation costs associated with the various lawsuits, the court found that these losses were not "direct" losses but rather instances when Simon was held vicariously liable for third party losses caused by the tortious acts of its employee.

The trial court rejected the argument that Simon "held" the game pieces that Jacobson stole and that this was therefore a covered loss on the ground that Simon failed "to demonstrate the existence of a bailee or trustee relationship with any of the third party litigants."

(e) *Simon's Theory on Appeal*

On appeal, Simon contends that "the undisputed facts establish that the theft of the McDonald's game pieces from Simon's possession by Simon's employee was a 'direct loss' of covered property."

## DISCUSSION

1. *Simon's Alleged Losses Detailed in Its Discovery Responses Were Not Covered Losses*

Both policies provide that the insurer will pay for loss of, and loss from damage to, *property*. Property insurance is a type of insurance with its own historical development,[6] and which is now available to cover "just about any type of property that exists in the modern world." (10A Couch on Insurance (3d ed. 2005) § 148:1, p. 148-8.)

▪ The self-evident point is that property insurance is insurance of *property*. While in the modern setting "just about any type of property" may be insured, the insured item must nonetheless be property.

---

[6] "Historically, property insurance grew out of the insurance against the risk of fire which became available for ships, buildings, and some commercial property at a time when most of the structures in use were made wholly or primarily of wood. Modern property insurance continues to offer protection against fire, but has also undergone considerable expansion." (10A Couch on Insurance, *supra*, § 148:1, p. 148-8.)

■ Given this premise, the threshold requirement for recovery under a contract of property insurance is that the insured property has sustained physical loss or damage. (10A Couch on Insurance, *supra*, § 148:46, p. 148-80.) "The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer where the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (10A Couch on Insurance, *supra*, § 148:46, p. 148-81, fns. omitted.)

Under the foregoing test, it becomes apparent that the termination of Simon's business because McDonald's and others cancelled their contracts with Simon is not the physical loss, or damage, to insured property. Nor are payments to settle litigation, defense costs and costs of winding up its business physical damage to property.

The trial court's reference to "direct losses" is based on *Vons Companies, Inc. v. Federal Ins. Co., supra*, 212 F.3d 489, 491.[7] The context of that decision, as well as the authority on which it relies (*Lynch Properties, Inc. v. Potomac Insurance Co.* (5th Cir. 1998) 140 F.3d 622), make it clear that the reference to "direct" losses is intended to mean *direct losses to property*, i.e., physical damage to insured property. In *Vons Companies* the dishonest employee had provided false financial information; there was no loss of, or damage to, property in that case, and the court held that therefore Vons could not rely on a property insurance contract. And *Lynch Properties, Inc. v. Potomac Ins. Co., supra*, 140 F.3d at page 629 expressly refers to employee dishonesty policies that insure "against the risk of property loss through employee dishonesty."

■ The fact is that not every dishonest act of an employee is an insured loss under a contract of property insurance. There must be loss of, or damage to, insured property; to use Couch's phrase, "detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property" (10A Couch on Insurance, *supra*, § 148:46, p. 148-81) is not compensable under a contract of property insurance. In addition to *Vons Companies, Inc. v. Federal Ins. Co.*, another case that illustrates this point is *U.S. Gypsum Co. v. Insurance Co. of North America* (7th Cir. 1987) 813 F.2d 856. In this case, the dishonest employee leaked trade secrets to a company competing with his employer, U.S. Gypsum. The competitor earned $139,298.58 from this leaked information, which U.S. Gypsum would have earned but for the

---

[7] "Under the insuring clauses, Vons is covered only for direct losses to Vons caused by its employee's dishonesty, not for vicarious liability for losses suffered by others arising from its employee's tortious conduct." (*Vons Companies, Inc. v. Federal Ins. Co., supra*, 212 F.3d at p. 491.)

information leaked to the competitor. The court held that there was no loss of, or damage to, property in that U.S. Gypsum did not "lose" the leaked formula and that, for this reason, there was no insured loss under the property policy. (*U.S. Gypsum Co. v. Insurance Co. of North America, supra,* at pp. 857–858.)

One additional feature of *U.S. Gypsum* that is also found in this case is that lost income caused by the theft is excluded under the policy.[8] (*U.S. Gypsum Co. v. Insurance Co. of North America, supra,* 813 Fed.2d at p. 857.) This underlines the fact the policies here insure against physical loss of or damage to property, and not against detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

It is also true that the bulk of the losses and damages claimed by Simon in its discovery responses were excluded by the provisions of the Gulf and Federal policies. Loss of income is excluded under both policies, which effectively excludes the loss of Simon's business, measured by its loss of income.

In sum, we find that the losses that Simon claimed to have sustained in its discovery responses were not covered by the property insurance contracts issued by Gulf and Federal.

2. *Simon's Contention That the Theft of McDonald's Game Pieces Was a Covered Loss Is Without Merit*

We find without merit Simon's argument that because it "held" the McDonald's game pieces, it was "legally liable" for them and that this meant that the theft of the pieces was a covered loss. We set forth in the margin the provision of the policy on which Simon relies.[9]

We begin with the sound observation of the court in *Lynch Properties, Inc. v. Potomac Insurance Co., supra,* 140 F.3d at page 629 that "[m]ere insertion of the words 'legal liability' into an employee dishonesty policy does not transform the policy into a liability policy." "A direct loss to Vons may, of course, be caused by its employee's theft of property for which it is legally liable, the typical case being where the insured is a bailee or trustee of

---

[8] As in the case before us, the policy in *U.S. Gypsum Co. v. Insurance Co. of North America, supra,* 813 F.2d at page 857, covered " '[l]oss of [m]oney, [s]ecurities and other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the employees . . . .' "

[9] "The Company's liability under this coverage section shall apply only to **Money, Securities** or other property owned by the **Insured** or for which the **Insured** is legally liable, or held by the **Insured** in any capacity whether or not the **Insured** is liable . . . ." (Original boldface.)

property." (*Vons Companies, Inc. v. Federal Ins. Co., supra,* 212 F.3d 489, 491.) The trial court found that Simon had failed to show the existence of a bailee or trustee relationship.

While we are inclined to agree with the trial court that the record does not reflect facts that show that Simon was either a trustee or a bailee, we think that Simon's claim fails at a more basic level.

The fact is that, when it comes to the game pieces, Simon has in effect admitted that it suffered no direct loss of property. As noted, Simon's discovery responses, including the deposition on Terrence Wallock, concede that Simon is not seeking to recover the value of the game pieces. Thus, this case presents the somewhat unusual instance where it may be assumed that the theft was a covered loss, but the loss was not sustained by the insured. In other words, we may agree with Simon that the theft of the McDonald's game pieces was a covered loss because (a) the game pieces were "property," which (b) were held by Simon "in any capacity." We do not agree that the loss of the approximately $21 million worth of game pieces[10] was borne by Simon. Simply put, it was McDonald's, and not Simon, who paid for the stolen prizes.

We must reject Simon's contention that the value of the stolen game pieces were the replacement giveaway contests, in the amount of $25 million, instituted by McDonald's. Obviously, if the game pieces had any value apart from the cost of the paper or materials, their value was their redemption value. But even if this were not so, it is true that the replacement contests were funded by McDonald's, Firemen's Fund and American Dynasty and not by Simon. Here again there may be a covered loss, but the loss was sustained by McDonald's and the carriers.[11] For this reason, neither policy applies.

Finally, we do not agree with Simons that under *Alberts v. American Casualty Co.* (1948) 88 Cal.App.2d 891 [200 P.2d 37], it is enough if it is only "liable" for the game pieces. In *Alberts v. American Casualty Co.,* a hotel's receipts in excess of $1,800 and $925 belonging to a guest disappeared from the hotel safe. The hotel had not paid the guest his missing $925, and the insurer sought to avoid payment on the policy for this reason. Simon claims that the court in *Alberts* rejected the insurer's argument, holding that the loss of $925 was covered because the hotel was "liable" to the guest.

---

[10] This was the estimated redemption value of the stolen game pieces.

[11] We note in the margin that Simon's position on the loss of the game pieces continues to be inconsistent. On the one hand, in the trial court Simon claimed that it was seeking the value of the replacement contests, and not the redemption value of the game pieces, a position that Simon appears to affirm in its opening brief. However, in its reply brief Simon appears to claim the redemption value of the game pieces.

Simon omits to mention that the guest sued the hotel for $925, and that the hotel was held to be liable for that sum, although it had not as yet paid the guest. (*Id.* at pp. 898–899.) In other words, there was clearly a loss of $925 on the part of the guest, something that is not true of this case, since it was McDonald's and the carriers who shouldered the loss, and not Simon. And of course it is also true that, unlike *Alberts v. American Casualty Co.*, no court has held Simon "liable" for the stolen game pieces.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

Rubin, Acting P. J., and Boland, J., concurred.