*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FIRST DEFIANCE FINANCIAL CORPORATION,
FIRST FEDERAL BANK OF THE MIDWEST, and
FIRST INSURANCE AND INVESTMENTS, INC.,
     *Plaintiffs-Appellees/Cross-Appellants*,

     v.

PROGRESSIVE CASUALTY INSURANCE
COMPANY,
     *Defendant-Appellant/Cross-Appellee.*

Nos. 10-3943/3944

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 08-02429—Jack Zouhary, District Judge.

Argued: January 19, 2012

Decided and Filed:  August 1, 2012

Before:  SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Scott Schmookler, CLAUSEN MILLER, PC, Chicago, Illinois, for Appellant/Cross-Appellee. William James Pohlman, VORYS, SATER, SEYMOUR & PEASE LLP, Columbus, Ohio, for Appellees/Cross-Appellants.  **ON BRIEF:** Scott Schmookler, CLAUSEN MILLER, PC, Chicago, Illinois, for Appellant/Cross-Appellee. William James Pohlman, VORYS, SATER, SEYMOUR & PEASE LLP, Columbus, Ohio, Phillip J. Smith, VORYS, SATER, SEYMOUR, AND PEASE LLP, Cincinnati, Ohio, for Appellees/Cross-Appellants.  Michael J. Hendershot, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Amicus Curiae.

     SUTTON, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined.  COOK, J. (pp. 13–21), delivered a separate dissenting opinion.

1

————————

**OPINION**

————————

SUTTON, Circuit Judge.  This insurance-coverage dispute arises from a policy designed to protect financial institutions from losses caused by dishonest employees. Trying to recover nearly one million dollars stolen by an employee from client brokerage accounts, three financial institutions sued the insurance company that issued the policy. The district court held that the policy covered the losses and granted summary judgment to the financial institutions.  We affirm the court's liability judgment and all but one of its damages calculations.

I.

First Defiance Financial Corporation is a bank-holding company.  It owns First Federal Bank of the Midwest, a traditional bank, and First Insurance and Investments, an investment firm.  All three financial institutions, collectively First Federal, were designated as insureds under a fidelity insurance policy issued by Progressive Casualty Insurance Company.  The policy insured against "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others." R.39-2 at 42.  The policy defined "employee" to include "a [d]ual [e]mployee who is . . . a registered representative of a third-party broker/dealer . . . in addition to his or her employment by the [i]nsured."  *Id*. at 43.

Jeffrey Hunt was a dual employee of First Defiance and a third-party broker-dealer, Online Brokerage Services.  As an investment advisor, he managed discretionary brokerage accounts for First Defiance's clients by selecting stocks, bonds and other investments for them.  Hunt traded securities through Online Brokerage Services.  A third institution, National Financial Services, held each client's assets in individual accounts accessible only to First Defiance's investment advisors in their dual role as an advisor and broker.  When clients opened these accounts, they directed National Financial Services as follows:  "I (we) have instructed My Broker/Dealer to establish,

in my (our) behalf, and as my (our) agent an account with you.  I (we) have appointed My Broker/Dealer as my (our) exclusive agent to act for and on my (our) behalf with respect to all matters regarding my (our) account with you."  R.39-6 at 5.

In April 2007, First Defiance learned that Hunt had transferred money from his clients' brokerage accounts to his own bank account.  *Id.* at 4–5.  Nineteen of First Defiance's clients lost $859,213.35 from Hunt's theft.  First Defiance reimbursed the stolen money and an additional $72,707.96 to cover lost interest and unrealized client income.  All told, First Defiance paid $931,921.31 to its clients to cover the defalcation.

In addition to its policy with Progressive, which had a $125,000 deductible, First Defiance held a no-deductible fidelity policy with the Cincinnati Insurance Company to cover employee-dishonesty losses up to $50,000.  Cincinnati Insurance paid $50,000 for the financial institutions' losses stemming from Hunt's fraud.

First Defiance filed a proof of loss with Progressive, claiming $907,597.23 in covered losses.  R.46-1 at 79.  Progressive denied the claim, and First Defiance filed this lawsuit in state court, which Progressive removed to federal court.  The district court held that First Defiance's losses were covered under the policy as a matter of law and awarded $564,006.75 to it.  Progressive appeals the district court's liability ruling and part of its damages ruling.  First Defiance cross-appeals other components of the damages ruling.

## II.

The liability appeal implicates three requirements under the insurance policy: (1) whether the stolen money was "covered property"; (2) whether Hunt's theft caused a "direct loss" to the banks; and (3) whether Hunt committed his dishonest acts "with the manifest intent" to cause the loss.  R.39-2 at 42.  First Defiance meets each one.

*Covered Property*.  The policy covers "loss of [p]roperty (1) owned by the [i]nsured, (2) held by the [i]nsured in any capacity, or (3) owned and held by someone else under circumstances which make the [i]nsured responsible for the [p]roperty prior to the occurrence of the loss."  R.39-2 at 19.  The theft does not meet the first definition,

as Hunt stole client funds, not First Defiance's funds, not in other words funds "owned" by the insured. Hunt was not trading with house money.

The stolen assets may well satisfy the second definition of "property," as First Defiance "held" the property for its clients and seems to meet the modest requirement of doing so "in any capacity." But we need not resolve the point, as the assets readily meet the third definition.

At the time of the theft, National Financial, a custodian bank, owned the assets and held them for First Defiance's clients. That surely counts at a minimum as property "owned and held by someone else."

The property likewise was held "under circumstances that make the insured responsible for the property." Why? By their terms, these were "discretionary" accounts, meaning that First Defiance had authority over them within the general and specific limitations set by each client. R.46-1 at 66–67. In view of the nature of these discretionary accounts, First Defiance and its employees owed a fiduciary duty to their clients—to look after their clients' interest ahead of their own—a first prerequisite of which was not to take the funds for themselves. *See* R.46-1 at 66; *see generally SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963).

First Defiance's fiduciary responsibility also arose "prior to the occurrence of the loss." The duty was prospective, requiring the bank to manage the assets for the client's benefit from the moment the fiduciary relationship was formed and from the moment the clients gave the funds to the bank. *See* R.46-1 at 66; *Capital Gains Research Bureau*, 375 U.S. at 191. In opening an account, clients agreed to appoint an investment advisor, jointly employed by First Defiance and a third-party broker-dealer (here Hunt), as the "exclusive agent to act for and on my behalf with respect to all matters regarding my account." R.39-6 at 5; *see also* R.46-1 at 67 ("Client authorizes [a]dvisor to give [c]ustodian instructions for the purchase, sale, conversion, redemption, exchange or retention of any security, cash or cash equivalent or other investment for the [a]ccount.") Clients instructed National Financial to look "solely to my broker/dealer and not me with respect to . . . orders or instructions . . . and to deliver confirmations, statements, and all

written or other notices . . . to my broker/dealer."  R.39-6 at 5.  That First Defiance, as opposed to National Financial, updated clients with quarterly account statements proves the point.  What financial institution sends account statements to clients for money for which it is *not* responsible?

The straightforward words of this definition of "covered property" show that it applies to Hunt's defalcation.  So too does an *exclusion* from coverage in the same policy.  The policy excludes coverage for "loss[es] resulting . . . from transactions in a customer's account . . . *except* the unlawful withdrawal and conversion of [m]oney . . . from a customer's account by an [e]mployee provided such [loss] is covered under [the rest of the policy]."  R.39-2 at 43 (emphasis added).  The policy thus excludes general losses from customer-account transactions but exempts from the exclusion any "unlawful withdrawal and conversion."  Why add this language if the policy does not cover employee thefts of this sort?  Progressive has no answer.  And we cannot identify one on our own.

Progressive insists that First Defiance was not responsible for the money because every client signed a disclosure form recognizing that First Defiance could not make any guarantees about the brokerage accounts.  But the disclosure form disclaims liability for market losses, not losses through a breach of fiduciary duty or for that matter outright theft.  The form concerns the "separation of traditional bank accounts and the new brokerage account being established."  R.39-7 at 2.  It informs clients that their brokerage accounts are not FDIC-insured, are not bank deposits, "are not guaranteed by the bank," and "are subject to market risk, including the possible loss of the principal invested."  *Id.*  All of this tells the client that the principal in a brokerage account is not guaranteed in the way that the principal in a traditional bank account is.  None of it undermines First Defiance's responsibility to its clients as a fiduciary or permits First Defiance's employees to embezzle client funds.

Progressive adds that because the client contracts did not establish "liability" *before the loss*, First Defiance could have incurred liability only after Hunt stole the money, giving rise at most to a potential tort claim against the bank and at most to the

possibility of liability *after the loss*. This argument has several flaws. The definition applies to "responsibility" before the loss, not to liability. The fiduciary relationship between First Defiance and its clients, which pre-dated the thefts, made First Defiance responsible for transactions undertaken with a client's money from the moment the fiduciary relationship was formed. If adopted, moreover, Progressive's approach would convert this definition of covered property into empty words, signifying little if indeed anything at all. The point of the provision is to reach property not owned and not held by the insured but *for which the insured is responsible* nonetheless. That responsibility need not be established by a tort verdict, which necessarily cannot happen before the theft; it *can* be established by the terms of the account between the bank and the client and the fiduciary duties that spring from them. We break no new ground in holding that fiduciaries bear responsibility for thefts from client accounts, as opposed to the inevitable swings in the market to which all investors are exposed. Acceptance of the risk of market fluctuations does not include acceptance of the risk of theft.

The brokerage agreements, it is true, do not spell out First Defiance's responsibility by saying, for example, "If instead of investing your money our employees steal it from you, we will return the money." But that understandable reality is not a deal breaker. The absence of such language does not disprove that the nature of the relationship—a fiduciary one—itself established this responsibility before the loss. It would be remarkable, at any rate, to insist on such language. We doubt that such language *ever* appears in brokerage agreements for the same reason other contracts do not spell out like-minded guarantees implicit in other transactions: A grocery receipt does not spell out the store's obligation to refund the price of food poisoned by a disgruntled employee; a plane ticket does not detail the airline's responsibility to refund the ticket price if a rogue pilot flies the plane to the wrong destination; and a restaurant does not promise to repay a customer if a waiter double-charges for a meal.

*Direct loss*. Progressive submits that Hunt did not "directly" cause the plaintiffs' losses because he stole money from *customer* accounts, not from the financial institutions themselves. This is a variation on a just-rejected theme. The "property loss"

covered by the policy, as shown,   includes assets "*held by someone else* under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss."   R.39-2 at 19 (emphasis added).   If property qualifies as "covered property," and a dishonest employee steals it, the employee "directly" causes the loss.  It is as simple as that, and that is true under any definition of "directly."  It thus makes no difference whether the phrase "direct loss," as used in most fidelity insurance policies, establishes a proximate cause standard or something more exacting, *compare, e.g.*,  *Scirex Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 850 (3d Cir. 2002) (applying proximate cause test) *with Vons Cos., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 491–93 (9th Cir. 2000) (purporting to apply a stricter standard and stating that "direct means direct" cause), or indeed whether the distinction between direct cause and proximate cause is a meaningful one, *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) (questioning the distinction and noting that proximate cause itself "requires only some *direct* relation between the injury asserted and the injurious conduct alleged" (emphasis added)).

Progressive's long list of citations does not refute the point.  The unifying theme of its authorities is that losses contingent on things *other than an employee's fraud* are not "direct" under most fidelity policies.  *See Vons Cos.*, 212 F.3d at 490–92 (no direct loss where insured settled with third parties who lost money in part because of an employee's dishonest representations to them); *Universal Mortg. Corp. v. Wurttembergische Versicherung AG*, 651 F.3d 759, 764 (7th Cir. 2011) (no direct loss where insured's losses were due to buy-back provisions in sales contracts for fraudulent loan packages, not employee dishonesty in making sub-standard loans); *RBC Mortg. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 735 (Ill. App. Ct. 2004) (same); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617, 626 (Wis. Ct. App. 2003) (no direct loss where employee's dishonesty led third parties to make bad loans and sue the insured when the borrowers defaulted).

No such contingency exists here.  Hunt stole client money.  The only question is whether it was "covered property" under the policy.  It was.  All of these cases are beside this fundamental point.

Nor does *Lynch Properties, Inc. v. Potomac Insurance Company of Illinois*, 140 F.3d 622 (5th Cir. 1998), solve this problem.  A bookkeeper misappropriated funds from the personal bank accounts of Mrs. Lynch, the mother of the president of Lynch Properties.  *Id*. at 625.  Lynch Properties had no relationship to Mrs. Lynch's personal accounts, which she kept at other financial institutions and which had no connection to the company.  *Id*.  The company sued to recover Mrs. Lynch's lost funds from a fidelity insurance policy that covered losses to property "for which [Lynch Properties] is legally liable."  *Id*. at 627.  The Fifth Circuit held—correctly, we might add—that the policy did not apply because it did not "extend coverage to the theft of customer property by the insured's employees *where the insured has no interest in the misappropriated property*."  *Id*. at 630.  Not so here.  First Defiance contracted with its clients to manage their investment accounts as a fiduciary, which not only gave them an interest in the misappropriated property but also made them *responsible* for it.

*Manifest intent*.  That leaves one other question under the policy:  Did Hunt have a "manifest intent" to cause First Defiance a loss?  The phrase does not establish a subjective standard; it establishes an objective one, meaning "apparent or obvious." *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir. 1991).  An insured meets the requirement where "a particular result is substantially certain to follow from conduct." *Peoples Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 113 F.3d 629, 634 (6th Cir. 1997).  That was assuredly true here.  In view of the fiduciary relationship between First Defiance and its clients, a theft from client accounts by a First Defiance employee would be substantially certain to cause losses to the bank.

Nor was there any way Hunt's fraud could benefit the employer.  *See St. Paul Fire*, 942 F.2d at 1036.  "Embezzlement is a zero-sum game.  For the employee to win, the employer must lose." *Id*.  Just as there are no free lunches from an economist's perspective, there are no free thefts from a bank's perspective.  Hunt stole client money, and the terms of the client accounts and the underlying fiduciary duties arising from them made First Defiance responsible for paying it back.

Neither is this a circumstance involving a damages contingency, as when an employee makes bad loans and no loss occurs until the loans fail. *See Peoples Bank*, 113 F.3d at 634. First Defiance gave Hunt access to its clients' assets for investment purposes, but he pocketed the money instead. It was "substantially certain," indeed absolutely certain, that his employer would incur a loss as a result of this misappropriation of client funds.

The dissent worries that our decision "negates the 'prior to the occurrence of the loss' limitation" on fidelity bond coverage. Not so. First Defiance became "responsible" for money in its customers' accounts when they opened their accounts and appointed a First Defiance advisor to select and execute their investments, long before—prior to—the loss of some money in those accounts caused by Hunt's theft.

Nor, to obtain coverage, must First Defiance point to a provision of the brokerage accounts that uses the words "fiduciary" or "responsible." The language of the insurance contract explains why. The policy covers property "owned and held by someone else *under circumstances* which make the insured responsible" for the property. R.39-2 at 19 (emphasis added). That the (fiduciary) circumstances of this discretionary account make First Defiance responsible for *its* employee's theft of *its* clients' funds hardly construes "responsibility" too "broadly." Dissent at 15. The search for a (remarkable) disclaimer that customers "assume the risk of employee theft" is a strawman of the dissent's own making. *Id*. at 2 n.1. Neither the one (you are on your own if our employees steal your money) nor the other (we will pay you back for such thefts) customarily (if ever) appears in such contracts, and this insurance policy not surprisingly did not demand the one or the other. The policy says only that the "circumstances" of the relationship must make the insured "responsible" for the money before the theft. Asked and answered.

The dissent's discussion of the drafting history of these bond provisions is a distraction, relevant only to *other* interpretive issues raised with respect to these contracts, not to the issues dispositive here. The premise of the discussion is a series of one-off cases that do not involve employee thefts from fiduciary accounts for which the

insured is responsible from the moment the funds are placed in the account, which is to say long before the theft.  Emblematic of the problem is the dissent's discussion of *Lynch*.  To repeat, the insured in that case had no responsibility for the outside, embezzled accounts, while First Defiance created the accounts for its customers and was accountable for the money in them from the get-go.  That presumably is why the insured in *Lynch* "d[id] not argue . . . that it was legally liable for the funds prior to their theft" but that it was "vicariously liable" for its employee's acts with respect to property held by others and for which it had no responsibility.  140 F.3d at 629.  How then did the insured in *Lynch* have "at least as much responsibility for the customer . . . account[s]," Dissent at 17–18, as First Defiance had here?  I do not know.

### III.

Progressive argues that the damages award was too high—that it improperly permitted a $57,084.51 recovery for lost interest.  The policy, it points out, excludes coverage for "potential income, including but not limited to interest and dividends, not realized by the Insured."  R.39-2 at 14.  The exclusion speaks to lost interest not realized by the *insured*, not to interest payments owed to customers.  The interest payments owed to First Defiance's customers were not income to First Defiance; they were unpaid liabilities.  That is why Progressive's case citations do not aid their cause; they address lost future income to the insured.  *See, e.g.*, *First Am. State Bank v. Cont'l Ins. Co.*, 897 F.2d 319, 329 (8th Cir. 1990) (excluding coverage for future interest payments not yet owed to the insured); *U.S. Gypsum, Co. v. Ins. Co. of N. Am.*, 813 F.2d 856, 857–59 (7th Cir. 1987) (excluding coverage for lost income caused by theft of a trade secret).  The district court properly included this money in the damages award.

First Defiance submits that the damages award was too low.  It argues that the district court should not have deducted its $202,779 settlement with Online Brokerage Services from the damages award but should have applied it against the deductible.  The settlement agreement proves otherwise.  It says that the settlement money "reflects [First Defiance's] losses attributable to" these brokerage customers and that "[First Defiance] shall not be entitled to make any further recovery from Progressive on account of" those

customers.  R.54-1 at 3.  It adds that "Progressive and [First Defiance] expressly reserve for the [c]ourt . . . any dispute concerning how the [settlement payment] shall be applied for purposes of calculating the amount, if any, subject to coverage under [Progressive's policy]."  *Id.*

First Defiance does not dispute that the district court's method of calculation was *one* reasonable way of ensuring that the bank did not receive additional recovery from Progressive on account of losses covered in the settlement agreement.  *See* Second Br. at 53–55; Fourth Br. at 3–11.  Its only complaint is that there was another way, one that is more equitable in its view.  But the terms of the settlement reserve that fair-minded judgment to the trial court, not to First Defiance.  The district court reasonably concluded that the policy required the deductible *and* the Online Brokerage Services settlement to be deducted from Progressive's liability.  We agree, and we agree that this is the most equitable allocation of the losses.

The district court separately reduced First Defiance's recovery by $50,000 because the bank received that amount from Cincinnati Insurance based on another employee-dishonesty policy.  First Defiance disagrees with the district court's adjustment, and respectfully so do we.  One premise of the district court's adjustment is correct:  "Where two insurance policies cover the same risk" and both claim to be "excess insurance over other valid, collectible insurance," Ohio courts apportion liability between both insurers according to the limits of their respective policies.  *Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.*, 361 N.E.2d 1052, 1052 (Ohio 1977).  But another premise is not:  The rule applies only where the two policies cover the same risk.  *Id.* (two policies applied to same vehicle accident); *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, No. L-10-1095, 2010 WL 4157403 at *3–4 (Ohio Ct. App. Oct. 22, 2010) (same).  When two policies claim to be excess over other policies insuring *the same risk*, a judgment enforcing the excess provisions in both policies would leave the insured with no coverage.  *Buckeye Union*, 361 N.E.2d at 1054.  Prorating in those circumstances "honor[s] the expectations of policyholders that they receive protection" while "still giv[ing] at least partial effect to the insurer's intent to escape primary liability."  *Id.*

None of these concerns applies here, however. The two policies insure against two different levels of risk: Cincinnati's policy covered losses from $0 to $50,000, R.46-1 at 82, while Progressive's policy covered losses from $125,000 (the deductible) to $9,000,000 (the policy limit), R.39-2 at 2. Cincinnati's policy thus provided primary coverage for the first $50,000 of loss, and Progressive's policy provided excess coverage for losses exceeding $125,000. That means First Defiance may recover under each policy without recovering twice for the same loss. Under these circumstances, it makes little sense to apply Cincinnati's excess-insurance provision, because Cincinnati's policy could *never* provide excess coverage to Progressive's policy, which covered losses well over Cincinnati's coverage limit. *See* Ed E. Duncan, *Ohio Insurance Coverage* § 8:4 (2011) ("[o]ther [i]nsurance clauses only come into play . . . where coverage is provided by all insurers on the same level"). All of this presumably explains why Cincinnati Insurance saw no conflict between the two policies and paid First Defiance up to the limit of its policy without enforcing its excess insurance clause.

The valuation clause in Progressive's policy does not change things. It provides that "[t]he value of any loss for purposes of coverage . . . shall be the net loss to the Insured after crediting any receipts, payments or recoveries . . . received by the Insured in connection with the transaction giving rise to the loss." R.39-2 at 17. It goes on to address the valuation of losses derived from money, securities, records, accounting books or other property. *Id.* Read in context, the provision has nothing to do with money recovered from other insurance policies, and we see no reason to read such a meaning into the provision when a separate section of the policy addresses "other insurance or indemnity." *Id.* at 19. Progressive is not entitled to credit Cincinnati Insurance's payment against First Defiance's recovery.

IV.

For these reasons, we affirm the district court's liability ruling and its damages ruling in all respects but one; we reverse the decision to subtract the Cincinnati Insurance $50,000 pay-out from the damages award. The case is remanded for further proceedings.

_____

**DISSENT**

_____

COOK, Circuit Judge, dissenting.   In affirming the district court's coverage conclusion, today's majority adopts a simplistic interpretation of the policy terms that disregards important coverage limitations.   As I see it, the policy required a direct loss to First Defiance, and Hunt's theft from non-custodial customer investment accounts does not qualify as such a loss.   Furthermore, neither the policy language nor the history of fidelity coverage supports the majority's view that the customer accounts constituted First Defiance's "Covered Property."   I respectfully dissent.

I.

The majority presents this case as a simple matter of contract interpretation.   To prevail, First Defiance must show three things: covered property, direct loss, and Hunt's manifest intent.   While I generally agree with this formulation, the policy language compels me to reject two points essential to the majority's coverage conclusion: (1) that First Defiance's fiduciary obligation for the customer accounts rendered them "Covered Property"; and (2) that the exception to the Brokerage Services Modification exclusion ("BSM exclusion") supports coverage.

*A.  Covered Property*

The term "Covered Property" includes property "owned and held by someone else under circumstances which make the [i]nsured responsible for the [p]roperty prior to the occurrence of the loss."   Under the majority's interpretation of "responsible for the [p]roperty prior to the occurrence of the loss," the mere fact that First Defiance undertook a prospective fiduciary duty—by promising good-faith investment services and accessing customers' accounts with their permission—rendered First Defiance responsible for the accounts prior to Hunt's theft.   Though I accept the *existence* of a fiduciary duty, I do not understand its relevance under the policy language. The word

"fiduciary" does not appear in the definition of "Covered Property" or any other relevant provision,[1] so for the majority to be right, fiduciary status must qualify under the "responsible for" language.

This cannot be. First, as a purely textual matter, reading *responsibility* so broadly negates the "prior to the occurrence of the loss" limitation. Though not clear from the majority opinion, First Defiance's fiduciary status arises by operation of law, either by statute or by common law duty; it does not flow from its investment agreements or the fidelity bond. If the word "responsible" encompasses such implied legal duties, then it does not matter whether the insured assumed such responsibility prior to the loss, as the policy requires. We should not read responsibility to swallow its prior-to-loss limitation. *See Cleveland Elec. Illuminating Co. v. City of Cleveland*, 524 N.E.2d 441, 444–45 (Ohio 1988) (instructing courts interpreting contracts "to give effect to the words used" and not "delete words used" or "insert words not used" (citation, internal quotation marks, and emphases omitted)); *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, 667 F.3d 669, 677 (6th Cir. 2011) ("We review policy terms in the context of the whole policy so as to read the policy terms in harmony.").

This is especially so, considering how the prior-to-loss language came to be. The Surety & Fidelity Association of America (SFAA) developed the current standard definition for "Covered Property" directly in response to two federal courts of appeals decisions on the prior versions of the provision. *See Vons Cos. v. Fed. Ins. Co.*, 212 F.3d 489, 491–93 (9th Cir. 2000); *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 628–30 (5th Cir. 1998). In those cases, coverage extended to property "for which the

---

[1]Nor, for that matter, does it appear in First Defiance's appellate briefs, other than a passing reference in its discussion of a completely unrelated policy provision. (*See* First Defiance Br. 46 n.182.)

During oral argument, First Defiance suggested that its investment agreements expressly assumed responsibility for the property in the customer accounts. Given the opportunity to elaborate, it could not identify such a provision, and the record reveals no support for this position. Instead, the undisputed record reflects that, at the time they opened their brokerage accounts, the customers signed acknowledgments recognizing that the accounts differed from bank accounts in that they "are not FDIC insured" and "are not deposits or other obligations of the bank and are not guaranteed by the bank." First Defiance reminded its customers of these risks in its periodic account reports. While these disclaimers did not tell customers that they would assume the risk of employee theft, they clearly did not tell customers that First Defiance assumed that responsibility, either.

Insured is legally liable."   Like the instant case, both *Vons* and *Lynch* involved settlements between insured employers and third parties harmed by the dishonest actions of covered employees; in each instance, the employer sought fidelity coverage for the amounts reimbursed to customers due to its legal liability for the customer losses.  Both courts declined to read "legally liable" so expansively, reasoning that the insured's interpretation transforms the standard fidelity-bond policy—a limited form of coverage—into a general liability policy.  *Vons*, 212 F.3d at 492–93; *Lynch*, 140 F.3d at 629.

The industry responded to these favorable interpretations in 2004 by incorporating a key distinction from *Lynch* into the definition of "Covered Property": for fidelity coverage to apply, the employer's responsibility for the loss must vest "prior to the occurrence of the loss."  *See Lynch*, 140 F.3d at 629 (emphasizing that "[the insured employer] does not argue . . . that it was legally liable for the funds prior to their theft" in distinguishing fidelity coverage from general liability coverage); Robert J. Duke, *A Brief History of the Financial Institution Bond*, *in* Financial Institution Bonds 1, 28 (Duncan L. Clore ed., 3d ed. 2008) [hereinafter "Duke, *A Brief History*"] (explaining that the covered-property revision "codif[ied]" the *Lynch* interpretation).  This change clarified that a fidelity bond, unlike a general liability policy, provides no coverage for an employer's vicarious liability for employee torts.  *See Vons*, 212 F.3d at 491–93; *Lynch*, 140 F.3d at 628–30; Duke, *A Brief History* at 27–28.[2]  This drafting history persuades me that the majority overemphasizes the word "responsible" at the expense of the limiting language "prior to the occurrence of loss."

---

[2]At the same time that the industry updated "Covered Property," it revised other bond terms to distinguish fidelity coverage from general liability insurance.  Duke, *A Brief History* at 21 (explaining that the 2004 revisions sought to "correct continuing misinterpretations of the bond by some courts"), 21–22 (noting the replacement of the manifest-intent requirement—construed by courts to encompass non-purposeful conduct—with an "active and conscious purpose" standard requiring purposeful conduct), 27 (addressing a modification to exclusion (t) that, along with the other revisions, "remove[d] any suggestion that the legal liability of the Insured has any effect on the obligations of the Underwriter"); *see also* Stephen M. Kranz et al., *Can Direct Mean Direct? Untangling the Web of Causation in Fidelity Coverage*, 16 Fid. L.J. 153, 154–56 (2010) (characterizing the new definition of "Covered Property" as a further industry attempt to narrow fidelity bond coverage, akin to the adoption of the direct-loss requirement).

Without addressing the drafting history, the court argues that the whole point of this "Covered Property" definition "is to reach property not owned and not held by the insured." No quarrel there; the definition obviously extends coverage to some non-custodial property. But the majority's focus on function overlooks the limits of the new policy language. Compared to the "legally liable" language of its predecessor, the new definition adopted in 2004 covered no new ground by reaching non-custodial property. Rather, the new definition added a temporal element—the *prior to loss* language—to cement the principle recognized in *Lynch*: the insured's responsibility for the stolen property must arise prior to the loss, not by virtue of vicarious liability. Nothing in the drafting history of this provision suggests that the substitution of the similar term "responsible" for the phrase "legally liable" overrides the limiting effect of "prior to the occurrence of loss." And, accepting the existence of a fiduciary duty, neither First Defiance nor the majority presents any authority for the proposition that a prospective fiduciary duty, by itself, qualifies non-custodial customer property for coverage under this term.

*Lynch*, in fact, held the opposite. The fraud in *Lynch* resembled the theft in this case in many respects. Lynch Properties, the insured employer, orally contracted to provide investment management services to the company president's mother. The employee/bookkeeper entrusted with monitoring the mother's offsite financial accounts then abused her check-drafting authority to raid the accounts. Lynch Properties reimbursed the stolen funds and then sought coverage for the losses. *Lynch*, 140 F.3d at 624–25. Notwithstanding the dishonest employee's breach of contractual and fiduciary duties, the court denied coverage, reasoning that

> [the insured employer] does not argue . . . that it was legally liable for the funds prior to their theft. . . . While [the employer] . . . argues how it may be vicariously liable for [the employee's theft], this argument fails to show how it was "legally liable" for the stolen property itself, that is, for the funds in [the customer's] account. Acceptance of [the employer's] argument would mean that [the] policy would cover any loss where an employee takes a customer's property in the course of their employment

responsibilities, regardless of whether the employer had any interest in the property itself.

*Lynch*, 140 F.3d at 629; *see also Vons*, 212 F.3d at 491–93 (denying coverage for investors' losses, where investors relied on fictitious grocery-diverting transactions fraudulently confirmed by an alleged employee of the covered employer).  Like Lynch Properties, First Defiance lacked responsibility under the fidelity bond for the property prior to the theft.

The court attempts to distinguish *Lynch*, arguing that the insured employer "had no relationship to [the mother's] personal accounts, which she kept at other financial institutions and which had no connection to the company."  True enough, but that is not a relevant distinction.  Although the terms of the investment services provided in *Lynch* differed somewhat, Lynch Properties and its dishonest bookkeeper had the same essential contractual and fiduciary relationship vis-a-vis the non-custodial customer accounts as did First Defiance.  For a fee, Lynch Properties agreed to do the following for Mrs. Lynch: "manage . . . property and investments," "writ[e] checks to pay bills, reconcil[e]  bank  account  statements,  and  prepar[e]  financial  statements." *Lynch*, 130 F.3d at 625.  Consequently, Lynch Properties bore at least as much responsibility for the non-custodial customer account—including an unchecked power of the purse—as Hunt did in this case.[3]  The fiduciary relationship predated the theft in both circumstances, but that did not make Lynch Properties responsible for the stolen money "prior to the occurrence of loss" under the bond.  If, as the court stresses, fiduciary status settles the coverage dispute, then *Lynch* should have come out differently.  Tellingly, First Defiance makes no attempt to square its arguments with *Lynch*.

---

[3]The investment agreements in this case required a third party to serve as custodian of the accounts and reserved ultimate investment discretion for the customer.  (R. 46, Ex. D, Investment Management Agreement §§ 1, 4.)  As I read it, Hunt's discretion extended no further than recommending investment decisions keyed to the client's financial circumstances and executing investment transactions within customer-approved parameters.

First Defiance could have assumed responsibility for the risk of theft prior to the loss—consistent with *Lynch* and the new "Covered Property" definition—by placing that guarantee in its investment agreements with customers. It did not. The court excuses First Defiance's silence on the subject of responsibility for employee thefts, finding an implicit do-no-harm guarantee in the "understandable reality" of business. In doing so, it conjures images of disgruntled grocery clerks, pilots, and waiters poisoning, marooning, and double-charging customers. Of course, I accept the existence of such implied legal duties. And given the well-established principle of respondeat superior, I agree that those hypothetical employers would probably suffer liability for their employees' malfeasance. But the employers' ultimate liability for those wrongs has no bearing on the scope of the insurance coverage they purchased. For non-custodial customer property, the policy required responsibility "prior to the occurrence of loss"—that is, a responsibility stemming from something more than a subordinate's unanticipated act. No such responsibility existed here.

One additional point requires a brief response. The majority alternatively suggests that the customer accounts qualify for coverage because First Defiance "held" the property. Not even First Defiance argues this, as the parties agree that third party National Financial maintained custody of the customer investment accounts. Nothing in the record indicates that First Defiance held the property in those accounts at the time of the theft, and we should not assume so.

*B. Exception to the BSM Exclusion*

Similarly, the court's reliance on an exception to the BSM exclusion misses the mark. Ohio law prohibits reading a coverage exclusion (or an exception thereto) to create coverage not otherwise provided by a policy's coverage provisions. *See, e.g.*, *Blake v. Thornton*, 914 N.E.2d 1102, 1107–08 (Ohio Ct. App. 2009); *Fid. & Cas. Co. of N.Y. v. Seven Provinces Ins. Co.*, 345 F.2d 227, 229 (6th Cir. 1965); *Gen. Mills Inc. v. Liberty Ins. Underwriters Inc.*, 498 F. Supp. 2d 1088, 1094 (S.D. Ohio 2007). This rule recognizes the limited purpose of coverage exclusions—that of *exempting* particular

items from coverage.   Courts examine coverage provisions to answer coverage questions, not exclusions and their exceptions.  The plain text of the BSM exclusion reinforces this general rule; it expressly defers to the coverage provided in the Insuring Agreement.  (R. 39, Ex. 1, Fidelity Bond at 42 (limiting the BSM exclusion and its exception with the caveat "provided such unlawful withdrawal and conversion is covered under Insuring Agreement (A)").)

Contrary to the majority's suggestion, this reading of the exception does not obviate it.  It reaches thefts from customer accounts that satisfy the covered-property and direct-loss provisions, such as accounts held by the insured or for which the insured assumes responsibility prior to the loss.  First Defiance's non-custodial customer accounts do not meet those standards.

## II.

The majority's broad interpretation of "Covered Property" also runs counter to key coverage limitations developed by the insurance and investment industries in the 1970s and 1980s: the direct-loss requirement and the manifest-intent requirement. The industry designed these terms to curtail expansive judicial interpretations treating fidelity coverage as a form of general liability insurance.  Accordingly, the direct-loss provision limits coverage to "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others," and the manifest-intent provision requires that the dishonest employee act "with the manifest intent: (1) to cause the Insured to sustain such loss, and (2) to obtain an improper financial benefit for the Employer or another person or entity."  In addition to these limitations, the industry adopted exclusions (t) and (v) precluding coverage for "damages of any type for which the Insured is legally liable" and "indirect or consequential loss of any nature," respectively.  *Cf.* Karen Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When Is Third-Party Recovery Allowed?*, 25 Tort & Ins. L.J. 92, 117–18 (1989) (contemplating the practical impact of the 1976–1986 limiting revisions to standard

fidelity coverage).  All of these limitations appear in Progressive's policy.  (Fidelity Bond at 13, 41.)

Courts responding to the revisions adopted during this period observed a clear distinction between limited fidelity coverage and general-liability insurance.  *See, e.g.*, *Universal Mortg. Corp.  v. Wurttembergische Versicherung AG*, 651 F.3d 759, 761–62 & n.1 (7th Cir. 2011); *Vons*, 212 F.3d at 492–93; *Lynch*, 140 F.3d at 628–30; *RBC Mortg. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 733 (Ill. App. Ct. 2004); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617, 623–24 (Wis. Ct. App. 2003); *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*, 676 N.Y.S.2d 559, 564 (App. Div. 1998).  For these courts, "'direct' means 'direct' and . . . in the absence of a third party claims clause, [the] policy d[oes] not provide indemnity for vicarious liability for tortious acts of [the insured employer's] employee."  *Vons*, 212 F.3d at 492–93; *see also Universal Mortg.*, 651 F.3d at 762 ("[W]hen an insured incurs liability to a third party—whether in contract or tort—as a result of employee misconduct, financial loss resulting from that liability is not 'directly' caused by the employee misconduct and therefore is not covered by fidelity bonds containing direct-loss language."); William T. Bogaert & Kerry Evensen, *Loss and Causation Under the Financial Institution Bond*, *in* Financial Institution Bonds 580, 596–97 ("The phrase 'resulting directly from' is unambiguous and its meaning indicates a stricter standard of causation than mere 'proximate cause.'" (internal footnotes omitted)).  So construed, the bond revisions of the 1970s and 80s served to remind that, despite prior interpretations to the contrary, fidelity coverage concerns only the fidelity of the *employee* to the *employer*.  *See Aetna*, 676 N.Y.S.2d at 565 (tracing the history of fidelity coverage to the turn of the twentieth century and recognizing that, as of 1998, "[n]othing in the history of these particular bonds, which comports with an historical understanding of what fidelity coverage is, indicates that the employee infidelity being covered as a risk could reach the employee's dishonesty toward third parties, absent an intent to cause a loss to the employer.").

Today's majority disregards this historical context and glosses over one of the district court's essential holdings: that the direct-loss requirement encompasses proximate causation. In the court's view, "[i]f property qualifies as 'covered property,' and a dishonest employee steals it, the employee 'directly' causes the loss. It is as simple as that, and that is true under any definition of 'directly.'" As stated above, I part company with the majority's interpretation of "Covered Property." But I also disagree with the relative priority given to that term—a policy "Condition[] and Limitation[]"—compared to the direct-loss limitation in the coverage clause. "The problem with th[at] argument is that it is founded on [a coverage definition], not the insuring clauses." *Vons*, 212 F.3d at 491; *cf. Nationwide Mut. Ins. Co. v. Wright*, 591 N.E.2d 362, 365 (Ohio Ct. App. 1990) (placing greater weight on language appearing in the coverage clause than on external limitations). The plain language and drafting history of the direct-loss requirement persuade me that the district court erred in grafting a proximate-cause standard onto the direct-loss language. Ohio's courts must settle that issue.

III.

I do not doubt that First Defiance could be held liable for Hunt's thefts, but this responsibility arises after the fact from its vicarious liability for its employee's misconduct. That is not a direct loss. While general liability policies ensure against such risks, a fidelity bond does not. *See, e.g.*, *Universal Mortg.*, 651 F.3d at 761–62 & n.1; *Vons*, 212 F.3d at 492–93; *Lynch*, 140 F.3d at 629; *RBC Mortg.*, 812 N.E.2d at 733. First Defiance did not purchase a general liability policy. I respectfully dissent.